Syllabus.

## ELIZABETH A. REYNOLDS *et al.*

### *v.*

## ABIGAIL SUMNER *et al.*

*Filed at Ottawa January 19, 1888.*

1. RESULTING TRUST—*when it arises.* If one purchase land with his own means, taking the title in the name of a third person, a stranger, the grantee will take only the naked legal title, and the law will imply a resulting trust in favor of the party paying the consideration.

2. And if a person, having the money or means of another in his hands to invest for the owner, uses the same in the purchase of property in his own name, the law will hold him to be the trustee of the owner of the money or other consideration used in effecting the purchase.

3. Or if several advance the price, and the title of the land is taken in the name of one of them, a trust will result in favor of the others for an undivided share of the property, in proportion to their share of the purchase price paid.

4. So where one enters public lands with land warrants owned by himself and another, and takes the legal title in his own name, a resulting trust will thereby be created in favor of the other, in proportion to his interest in the warrants, without regard to any contract between them as to how the title was to have been taken. The contract, if there be one, however, may be looked to as affording evidence of the relation between the parties and the character of the transaction.

5. STATUTE OF FRAUDS—*as applicable to a resulting trust.* The Statute of Frauds has no application to a resulting trust. The transaction, and acts of the parties from which a trust results, may be shown by parol evidence, as well as by that which is written. Such trusts are distinguished from an express trust in the manner of their creation.

6. LIMITATION—LACHES—*as to trusts.* In respect of resulting or implied trusts, *laches* or the Statute of Limitations may constitute a bar to an action or suit to declare and enforce them. While they may be barred by the mere lapse of time, yet within what time the bar will be held to be complete, must depend upon the circumstances of the particular case. Lapse of time is only one of many circumstances from which the conclusion of *laches* must be drawn, and each case must be determined in the light of the particular facts shown.

7. SAME—*when the statute begins to run—as against a trust—character of possession required.* The Statute of Limitations does not begin to run against a trust so long as it is acknowledged to exist by the trustee, nor until it is repudiated and disavowed by him. Possession, to create a

bar under the statute, must be open, notorious and adverse or hostile to the party sought to be barred. Where it is taken by a trustee or agent, it is the possession of the *cestui que trust* or principal, and can not be adverse until the trust is openly disavowed or denied, and this fact is brought home to the knowledge of the *cestui que trust.*

8. It does not follow, if a person having funds belonging to himself and another, to be invested in land in their joint names, takes the title in his own name, contrary to the contract under which he received the funds, that a resulting trust is not thereby created, or that the party so taking the title in his own name thereafter holds the title in hostility to the equitable rights of the other.

9. Same—*in equity—and at law.* Ordinarily, courts of equity adopt the time fixed by the Statute of Limitations for barring claims at law, in analogous cases, as the period to preclude a recovery in equity. But this rule is not inflexible, and its application will always depend, upon consideration of the allegation and proof, whether the presumption from which the bar arises, prevails. The presumption arising from the mere lapse of time may be repelled by proof of other facts and circumstances inconsistent with it.

10. Evidence— *entries in bank books—admissibility—to show the giving of a note—after the death of the person making the entries.* To prove the giving of a promissory note by A to B, which was discounted at a bank and afterward renewed, the entries in the bank books and the notices given by the cashier to A respecting the note, after having been proved and identified as genuine, and proof of the death of the person making them, are admissible in evidence against A in a suit in which it is desired to show his relation to the transaction in respect of which the note was given. Such entries made by the bank officers at the time of discounting and renewing the note, are a part of the *res gestœ,* and being made by persons having no interest in the matter in litigation, who are since dead, are competent evidence.

Appeal from the Circuit Court of Iroquois county; the Hon. Alfred Sample, Judge, presiding.

This was a bill filed July 20, 1882, by Elizabeth A. Reynolds, widow, and Sarah R. Hitt and Mary R. Diaz-Albertini, only heirs-at-law, of William F. Reynolds, deceased, against Edward C. Sumner. The bill, after stating the death of Reynolds (July 31, 1880,) and the interest of complainants, alleged that in December, 1852, said Reynolds and Sumner made and executed the following written agreement:

"Mem. of agreement made and entered into this the 31st day of December, 1852, between Edward C. Sumner, of the county of Benton, State of Indiana, of the one part, and William F. Reynolds, of the county of Tippecanoe, State aforesaid, of the other part:

"Witnesseth: Whereas, the said parties propose purchasing, say four thousand acres of land, in the State of Illinois, on joint account, it is agreed as follows: That the said Reynolds agrees to furnish the land warrants necessary to make the purchase, at whatever rates they cost him, and the said Sumner agrees to make the entries of land in the name of Edward C. Sumner and William F. Reynolds, who will be equal and joint owners of said land, the parties paying the necessary expenses in locating and selecting said lands. And for and in consideration of said Sumner's personal service in the selecting of said land, it is agreed and understood that one-half of the expense and cost of said lands will be refunded by the said Sumner to the said Reynolds at the expiration of one year from the date of these presents, without interest, the said Sumner having executed his note or bill to the order of the said Reynolds for the sum of, say two thousand dollars, which bill or note, if discounted or used by the said Reynolds, he is to protect for the period of one year, by renewals, and which note or bill will then be paid by said Sumner, or so much thereof as the one-half of said land may have cost, without interest, according to the within agreement."

The bill further alleged, that in pursuance of said agreement Reynolds purchased and delivered to Sumner twenty-five land warrants, for one hundred and sixty acres each, twenty-four of which the latter, on the first or second day of February, 1853, entered on the lands described in the bill, and that patents were issued by the government to Sumner, in his own name, for all of said land; that the other of such warrants being defective, Reynolds secured still another in lieu thereof, which Sumner also located, and received the patent therefor

in his own name. The bill also charged that Sumner pastured the lands for many years, and had cultivated them for the last ten years, and had rendered no accounts of the rents and profits, but had appropriated them to his own use; that Sumner had paid all the taxes on the land, except, in 1861, Reynolds, upon the written request of Sumner, sent him $600 in gold, and again, in 1865, $500, with which to pay taxes; that upon demand Sumner refused to render any account of the rents, etc., at times pretending that Reynolds never had any interest in said land, and at other times that he had purchased of said Reynolds his interest therein in his lifetime, but alleging that complainants were owners of the undivided half of the said lands. Prayer for partition, etc., and for account of rents and profits, etc.

On January 19, 1883, complainant filed a supplemental bill, showing the death of said Sumner intestate, and making his widow and heirs parties, and showing that he had sold certain of the lands in his lifetime.

The defendants answered, admitting the purchase of the warrants by Reynolds, and their delivery by him to Sumner, and that the latter entered them as alleged in the bill, but averring that Sumner, a short time thereafter, bought Reynolds' undivided half interest in the land, and paid for the same. The defendants amended their answer by striking out the admission above referred to, and in lieu thereof denied that Reynolds purchased said warrants, and alleging that Sumner purchased all of them with his own money. As amended, the answer admits the execution of the agreement set out in the bill; denies that Reynolds purchased and delivered to Sumner the land warrants; admits one of said warrants was defective, and was cancelled, but denies another was substituted in its place; admits that Sumner has pastured and farmed said lands, and rendered no account thereof, giving as a reason that he alone was interested therein. It also denies that Reynolds furnished any money with which to pay taxes on said land,

and avers that the said sum of $600 mentioned in the bill was obtained by Sumner of Reynolds as a loan; admits the death of Sumner and the heirship of defendants, and avers that Reynolds, for more than twenty years before his death, never claimed any interest in said lands; that he has frequently, since 1853, asserted that he had no interest in said lands, or money derived from the sale thereof, and sets up and insists upon the Statute of Limitations and the staleness of the demand as a bar. After the hearing, but before the decree, complainants amended their bill, averring that Sumner at no time prior to the year 1881 denied that Reynolds was an equal owner with him, but frequently, and through a series of years given, admitted and declared to said Reynolds and others, that he, Reynolds, was jointly with him owner of said lands. Replication was filed to the answer, and on the hearing a decree dismissing the bill was entered, and the cause is brought to this court upon the appeal of the complainants.

Messrs. Kay & Euans, Messrs. McDonald, Butler & Mason, Mr. S. P. Baird, and Mr. J. B. Sherwood, for the appellants:

That letters, entries and memoranda, whether in a book or any other form, made in the usual course of business, and at or about the time the transactions they record occurred, by a person not a party to the action, who is shown to have had means of personal knowledge of the facts recited, are competent evidence of such facts, see 1 Greenleaf on Evidence, sec. 120; *Humphreys* v. *Spear*, 15 Ill. 275; *Railway Co.* v. *Ingersoll*, 65 id. 399; *Vinal* v. *Gilman*, 45 Am. Rep. 562; *Moots* v. *State*, 21 Ohio St. 653; *Beaver* v. *Taylor*, 1 Wall. 637; *Fennerstein's Champagne*, 3 id. 145; *Insurance Co.* v. *Weide*, 9 id. 677; Abbott's Trial Evidence, 322.

It is not necessary that the letters, entries or memoranda should contain statements against the interest of the person who made them. 1 Greenleaf on Evidence, sec. 120; *Patteshall* v. *Turford*, 3 B. & A. 890.

Such letters, entries and memoranda are original and inde-
pendent evidence of the facts they recite.    It makes no differ-
ence whether the writer could testify to the same facts. *Vinal*
v. *Gilman*, 45 Am. Rep. 562; *Mather* v. *Robinson*, 41 Am.
Dec. 505; 1 Greenleaf on Evidence, secs. 115, 120.

If the person who wrote the letters, entries or memoranda
be dead, and he does not appear to have had any interest to
falsify, they may, upon proof of his handwriting, be read in
evidence.    Abbott's Trial Evidence, p. 322; 1 Greenleaf on
Evidence, sec. 120; *Beaver* v. *Taylor*, 1 Wall. 637; *Arms* v.
*Middleton*, 23 Barb. 571.

If the person who wrote the letters, entries or memoranda
be living, but is beyond the jurisdiction of the court, according
to the great weight of authority it is sufficient to show by others
that they were written in the due course of business at the time
of the transaction, by one having personal knowledge of the
facts recorded.    *Vinal* v. *Gilman*, 45 Am. Rep. 562; *Railway
Co.* v. *Ingersoll*, 65 Ill. 399; *Alten* v. *Berghans*, 8 Watts, 77.

If the book containing the entries be in the possession of a
person beyond the jurisdiction of the court, it need not be pro-
duced.    Examined and sworn copies of the entries are suffi-
cient.    *Vinal* v. *Gilman*, 45 Am. Rep. 562; *Burton* v. *Driggs*,
20 Wall. 125; *Deitz* v. *Regnier*, 27 Kan. 94.

The evidence shows that these entries were made at the
time the transaction they record occurred.    They constitute
parts of a chain of facts that naturally belong to the full ex-
ecution of the agreement set out in the bill.    They are not
hearsay, but "verbal facts" that actually took place, and hence
are competent as parts of the *res gestæ*.    1 Greenleaf on Evi-
dence, sec. 120; 1 Wharton on Evidence, secs. 258, 259; *Sill*
v. *Reese*, 47 Cal. 294; *Planter* v. *Planter*, 78 N. Y. 90; *Brush*
v. *Blanchard*, 19 Ill. 34; *Railway Co.* v. *Ingersoll*, 65 id. 399;
*Beaver* v. *Taylor*, 1 Wall. 637.

When an entry or memorandum, made by a party since de-
ceased, appears regular on its face, and is produced from the

proper custody, and especially if it is corroborated by other evidence, it is presumed, in the absence of testimony to the contrary, to have been made in the due course of business. 1 Wharton on Evidence, sec. 688, note 3; *Hoover v. Gehr,* 62 Pa. St. 136; *Boyer v. Sweet,* 3 Scam. 120; *Taliaferro v. Ives,* 51 Ill. 248.

As to express trusts, see *Kingsbury v. Burnside,* 58 Ill. 310; *Carpenter v. Davis,* 72 id. 14.

As to resulting trusts, see 1 Perry on Trusts, secs. 26, 126; Bispham's Eq. secs. 78, 79; Story's Eq. Jur. sec. 1201.

The presumption is, that it was the intention of both parties, at the time the trust was created, that Sumner should hold the undivided half of the lands in trust for Reynolds. The trust is a continuing and subsisting one until disavowed by the trustee, to the knowledge of the *cestui que trust.* Wood on Limitations, 439; *Bacon v. Rives,* 106 U. S. 99; *Jones v. McDermott,* 114 Mass. 403; *Shorter v. Smith,* 56 Ala. 208; *Seaman v. Cook,* 14 Ill. 504; *Carpenter v. Davis,* 72 id. 14; *Loften v. Witboard,* 92 id. 461.

No lapse of time, however great, will constitute a bar to a trust, so long as the trust is acknowledged to exist. Story's Eq. Jur. sec. 1520 a; Angell on Limitations, sec. 472; *Springer v. Springer,* 114 Ill. 550; *Cunningham v. McKindley,* 22 Ind. 149; *Oliver v. Piatt,* 3 How. 333; *Dow v. Jewell,* 18 N. H. 340; *Butler v. Lawson,* 72 Mo. 227; *Harder v. Harder,* 2 Sandf. Ch. 17.

This is a suit of purely equitable cognizance. There is no analogy between the remedy here sought and any remedy that is administered by a court at law. The statute, therefore, has no application. Wood on Limitations, 118; *Locke v. Caldwell,* 91 Ill. 417; *Kane v. Bloodgood,* 7 Johns. Ch. 89.

This being a suit by a *cestui que trust,* against trustees, to establish and enforce a subsisting trust which has never been denied, the statute has no application, and no length of time is a bar. Wood on Limitations, 413, 439; *Kane v. Bloodgood,*

7 Johns. Ch. 89; *Seymour* v. *Freer*, 8 Wall. 202; *Cholmondeley* v. *Clinton*, 2 Meriv. 93.

Possession, to constitute a bar to an action at law for the recovery of real estate, must be adverse in its inception, or since its commencement there must have been a denial of the true owner's title, brought to his knowledge and followed by a continuous adverse claim for twenty years. 3 Wait's Actions and Defenses, 99; *Turney* v. *Chamberlain*, 15 Ill. 271; *Clark* v. *Lyon*, 45 id. 388.

If the parties are tenants in common, the acts of hostility sufficient to manifest an adverse possession must be of the most unequivocal character. The appropriation of all the rents and profits, payment of taxes, and making cheap improvements, are not sufficient. *Busch* v. *Huston*, 75 Ill. 343; *Ball* v. *Palmer*, 81 id. 370; *Sydnor* v. *Palmer*, 29 Wis. 228.

Messrs. DOYLE, MORRISON & PEARSON, Messrs. R. P. & J. C. DAVIDSON, and Messrs. COFFRATH & STUART, for the appellees.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This is a bill to establish and enforce a trust in favor of appellants. On December 31, 1852, William F. Reynolds, under whom appellants claim, entered into a written agreement with Edward C. Sumner, under whom appellees claim, respecting the purchase of land warrants and the entry of public lands therewith. Under this agreement Reynolds was to furnish Sumner with warrants calling for four thousand acres of land, and the latter was to enter the land with such warrants in the joint names of Reynolds and Sumner, and, after the expiration of one year, Sumner was to refund to Reynolds one-half of the cost of the land, including expenses, but without interest thereon. At the time this agreement was entered into, Sumner gave Reynolds his promissory note for $2000, which was supposed to be about one-half of the cost and expenses of

the land warrants and of the entry of the land, and it was also agreed that if this note was discounted or used by Reynolds, he was to protect the same for one year, by renewal or otherwise, when it was to be paid by Sumner, or so much thereof as would be equal to one-half of the cost of said lands, without interest.

There can be no question as to the giving of a note of $2000 by Sumner to Reynolds, which matured in less than one year after its date, and that it was given for part of the purchase price of land warrants the latter had agreed to procure and furnish the former. This is apparent from the written agreement of the parties referred to. It appears, also, from entries in the books of the Branch Bank of Indiana, that this note was discounted in favor of Reynolds, and was afterwards renewed when due, whereby the time of payment was extended one year, as provided in the written agreement.

On February 1 and 2, 1853, Sumner located twenty-four land warrants, each of one hundred and sixty acres, and shortly afterward another for a like number of acres, making in all four thousand acres of land, in his own name, and which is the land involved in this controversy. The making of the written agreement of December 31, 1852, and the entry of the land, are not disputed, but it is denied that Reynolds furnished the twenty-five land warrants with which the entry was made.

Appellants contend, that Reynolds, on the day of the date of the written agreement, wrote to Gibson, Stockwell & Co., commission merchants of New York City, asking for twenty-five land warrants of one hundred and sixty acres each, and promising to send a draft for the cost, etc., and that on January 10, 1853, he sent a letter to that firm, enclosing a draft for $4823.38, in which he stated that the draft was for the purpose of paying for the twenty-five land warrants ordered December 31, 1852, and that this firm, on January 15, 1853, sent by letter to Reynolds twenty-five land warrants, as ordered, which he delivered to Sumner to make the entry upon

said land, and that they were so used. For the purpose of proving these facts, and as tending to show that the land warrants used by Sumner in the entry of these lands were furnished by Reynolds, and also that Sumner's note of $2000 was given, renewed and finally paid by the latter in part performance of the written agreement, the appellants produced in evidence the letters of said commission merchants to Reynolds, and sworn copies of the entries in their books and the books of the Branch Bank of Indiana, each of which was objected to as hearsay, and incompetent.

In the view we take of the case it is not necessary to determine whether these letters were competent evidence or not. We think, however, that the entries in the bank books, and the notices given by the cashier to Reynolds respecting Sumner's note, after having been proved and identified as genuine, and proof of the death of the person making the same, were admissible in evidence. The entries made by the bank officers at the time of the discounting and renewing of Sumner's note were a part of the *res gestæ,* and being made by persons having no interest in the subject in litigation, since deceased, are competent evidence. But if they are not competent, the frequent statements and declarations of Sumner as to Reynolds' interest in the land afford sufficient evidence, when considered in connection with the written agreement and the undisputed facts, that Reynolds did furnish the land warrants with which to make the entry of the land, as he had agreed. His statements and admissions to the witnesses Slaughter, Vennum, Evans, Brown, Stephens, O'Ferrall, Hitt, and others, and his letters to Reynolds in 1861 and 1865, asking for money with which to pay taxes on the land, show clearly that Sumner then regarded Reynolds as the equitable owner of one-half of these lands,—and this could only be so on the hypothesis that Reynolds owned one-half of the consideration paid in acquiring the government title. When Sumner's note fell due, he wrote to Reynolds, of date August 17, 1853:

"I received your letter day before yesterday—I find it was the 9th. I have sent my bill back as soon as I could. I had forgotten all about it.                      ,                E. C. SUMNER.

"N. B. You need not have sent me the bill; you might have put my name on it yourself."

This corresponds in date with the entries in the bank books and the notices issued by the bank, and would seem to strongly corroborate the position of appellant. It is not shown there was any transaction, other than the renewal of Sumner's note, to which it could refer.

Appellees introduced no evidence tending to show how Sumner came into possession of the land warrants used by him in the entry of this land, or that he paid anything therefor, but as the warrants show an assignment on their face to Sumner, direct from the persons to whom they were issued, prior to the date of the written agreement, they contend that it will be presumed that Sumner acquired them directly from the assignors, and at the several dates of the assignments. This presumption might arise if the law did not recognize the assignment of such warrants in blank, and authorize the holder, before or at the time of making entries with them, to fill the blank with the name of the person making the entry. In addition to this, it is evident, from the written contract, that Sumner, on December 31, 1852, did not have these warrants. If he had, he would probably not have entered into an agreement with Reynolds to furnish them. The fact that on the 1st day of February, 1853, a month after the date of the written agreement, we find Sumner in possession of the precise amount in warrants agreed to be furnished by Reynolds, and used by him for the purpose indicated in such agreement, and the further fact that Sumner paid his note given for one-half of the cost of the warrants, and his often repeated admissions of Reynolds' interest in the land, afford very strong and convincing proof that Sumner obtained the land warrants under and in pursuance of his written contract with Reynolds.

The law is well settled, that if a party purchase land and pay the purchase price, taking the title in the name of a third person a stranger to him, the grantee will take only the naked legal title, and the law will imply a resulting trust in favor of the party paying the consideration. And if a person having the money or means of another in his hands to invest for the owner, uses the same in the purchase of property in his own name, the law will hold him to be the trustee of the owner of the money or other consideration used in effecting the purchase. If two or more advance the price, and the title is taken in the name of one of them, a trust will result in favor of the other for an undivided share of the property, in proportion to his share of the purchase price paid. (*Smith* v. *Smith,* 85 Ill. 189; *Mason* v. *Showalter,* id. 133; *Loften* v. *Witboard,* 92 id. 461.) Therefore, if Sumner entered these public lands with land warrants owned by Reynolds, or by Reynolds and himself, and took the legal title in his own name, a resulting trust was thereby created in the lands entered, in favor of Reynolds, in proportion to his interest in the land warrants, without regard to the express contract between them. The agreement was, that the title should be taken in the names of Reynolds and Sumner, jointly. This Sumner failed to do, but procured the same to be patented in his own name. The trust arises, not out of the contract, but because of the interest of Reynolds in the warrants with which the entry was made and the title to the lands secured. The contract, however, may be looked to as affording evidence of the relation between the parties and the character of the transaction. From it we find that Reynolds was to furnish the land warrants with which to make the entry of the land, but he was to be only half owner,—he crediting Sumner one year, without interest, with one-half of the cost of the land. When, therefore, Sumner, having joint funds in his hands to be invested for the joint benefit of himself and Reynolds, invested the same in property in his individual name, a resulting trust arose in favor of Reynolds for the undivided

half of the land acquired by the investment. See authorities *supra; Bush* v. *Stanley,* 122 Ill. 406; Perry on Trusts, 139.

The Statute of Frauds has no application to a trust thus created. The transaction and acts of the parties from which a trust results, may be shown by parol evidence, as well as by that which is written. Such trusts are distinguished from an express trust in the manner of their creation. (Perry on Trusts, 137, 138; authorities *supra; Maffatt* v. *Shepard,* 2 Pin. 66; *Lewis* v. *Lewis,* 9 Mo. 182.) It does not follow, that if the title was taken in the name of Sumner, contrary to the provisions of the contract, a resulting trust was not thereby created, or that Sumner thereafter held in hostility to the equitable rights of Reynolds. The law will not presume an intention to defraud, but the conduct of Sumner will be referred to honest motives, in the absence of evidence showing why the title was taken in Sumner's name; nor will it be presumed, in view of the written agreement, that Reynolds intended to or did give his interest in this property to Sumner.

The Statute of Limitations, and the *laches* of Reynolds in his lifetime, are relied upon as a bar to the relief sought. Possession, to be a bar under the Statute of Limitations, must be open, notorious and adverse to the party sought to be barred. The rule seems to be well settled, in cases of express trust, that mere delay will not defeat a recovery, unless the trustee has repudiated or disavowed the trust, and the disavowal is known to the *cestui que trust.* If thereby the claim of the trustee, in respect of the trust estate, is held adversely to the *cestui que trust,* the law of *laches* may become applicable. *Speidel* v. *Henrici,* 15 Fed. Rep. 753; *Brown* v. *County of Buena Vista,* 95 U. S. 160.

In respect of resulting or implied trusts, *laches* or the Statute of Limitations may constitute a bar to the action. Such trusts may be barred by the mere lapse of time. While the better doctrine is, that the defense of *laches* may be availing in cases of resulting and implied trusts, yet within what time the bar

will be held to be complete, must depend upon the circumstances of the particular case. Lapse of time is only one of many circumstances from which the conclusion of *laches* must be drawn, and each case must be determined in the light of the particular facts shown. (*Boone* v. *Childs*, 10 Pet. 177; *Michoud* v. *Girod et al.* 4 How. 261; *Baker* v. *Reed*, 18 Beav. 398; *Carpenter* v. *Canal Co.* 35 Ohio St. 307; *Provost* v. *Gratz*, 6 Wheat. 481.) Ordinarily, courts of equity adopt the time fixed by statute for barring claims at law, in analogous cases, as the period at the end of which they will conclude recovery in equity. This rule is by no means inflexible, and its application will always depend, upon consideration of the allegations and proof, whether the presumption from which the bar arises prevails. The presumption arising from the mere lapse of time may be repelled by proof of other facts and circumstances inconsistent with it. When possession of trust property is taken by the trustee, under the trust, it is the possession of the *cestui que trust*, whether the trust be express or implied, and can not be adverse until the trust is openly disavowed or denied, and this fact is brought home to the knowledge of the *cestui que trust*. *Thompson* v. *Finch*, 22 Beav. 325; *Shroter* v. *Smith*, 56 Ala. 208; *Chicago and Eastern Illinois Railroad Co.* v. *Hay*, 119 Ill. 493; *Oliver* v. *Piatt*, 3 How. 411.

We have already shown that the equitable right of Reynolds in these lands was repeatedly recognized by Sumner. The existence of the trust in this case was, so far as shown, never disputed or denied by Sumner in his lifetime. The relations between Sumner and Reynolds were apparently most friendly from the inception of the trust, which, as we have seen, was a continuing trust, until disavowed by Sumner, and the disavowal known to the *cestui que trust*. We think the facts shown establish, that for many years the holding of Sumner, and his occupation and possession of these lands, were regarded by both Sumner and Reynolds as for himself and Reynolds. That the trust continued for the benefit of Reynolds is, we think,

fairly inferable from the record.　Wood on Limitations, 439; *Jones* v. *McDermott,* 114 Mass. 400; *Merriam* v. *Hassam,* 14 Allen, 516; *Bacon* v. *Rives,* 106 U. S. 99; *Springer* v. *Springer,* 114 Ill. 550.　So long as the equitable rights of Reynolds were acknowledged by Sumner, no *laches* could be imputed to him. So long as his trust and confidence were not abused, he might safely continue the same without forfeiting his rights.　Until the trust was repudiated, he had a right to rely upon the integrity and faithfulness of his trustee.　It was not until after the death of the trustee that the equities of Reynolds were denied, so far as shown in the proofs in this case, and the original bill herein was filed during his lifetime, and the supplemental bill shortly after his decease.

We think the circuit court erred in dismissing the bill.　The decree of the circuit court is therefore reversed, and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*Decree reversed.*