WARREN ET AL., APPELLANTS, v. ADAMS, APPELLEE.

1. RESULTING TRUSTS.

When real estate is purchased and the conveyance is taken in the name of one person while the price is paid by another, the beneficial interest or estate follows the consideration and inures to the party from whom the consideration comes.

2. WITNESSES, COMPETENCY.

Where the plaintiff in an action against heirs of a deceased person is called as a witness by the adverse parties and examined upon certain matters pertinent to some of the issues, he is thereby rendered competent for all purposes.

3. RESULTING TRUSTS.

The consent of the trustee to hold and dispose of the land for the benefit of the *cestui que trust*, or an agreement so to do, in case of a resulting trust, does not affect or change its nature. Such a trust results from the acts and not from the agreements of parties.

4. LIMITATIONS—TRUSTS.

The statute of limitations does not begin to run against that class of resulting trusts which are created with the consent of the trustee and *cestui que trust* until the trust is repudiated or disavowed by the trustee, and the knowledge of such repudiation or disavowal is brought home to the *cestui que trust*.

5. SAME.

The payment of taxes and the redemption of the land from tax sales by the trustee, being consistent with his duty, do not evidence a repudiation of his trust.

6. SAME.

The "color of title" referred to in the statute of limitations (Gen. Stat., sec. 2187) must arise out of some conveyance purporting to vest in the grantee an interest in his own right, adverse to the true owner, and not from one that constitutes him a trustee of the title for the benefit of such owner, and it must be made in good faith.

7. LACHES.

It seems that length of time alone is not sufficient to justify the court in refusing equitable relief. The circumstances under which the delay occurred, together with the lapse of time, must be such as to impute negligence to the party who seeks relief.

8. TRUSTS AND TRUSTEES—ACCOUNTING.

The trustee of a resulting trust having paid taxes upon the land is entitled, under the circumstances of this case, to reimbursement on account thereof before being divested of the title.

*Appeal from the District Court of Arapahoe County.*

| 19 | 515 |
| J20 | 463 |

| 19 | 515 |
| 21 | 327 |
| 22 | 182 |
| 5a | 403 |

| 19 | 515 |
| 25 | 351 |
| 19 | 515 |
| s26 | 405 |
| f13a | 75 |

| 19 | 515 |
| 27 | 276 |
| s27 | 294 |
| s27 | 297 |

| 19 | 515 |
| 29 | 360 |
| s29 | 365 |
| 29 | 366 |

| 19 | 515 |
| 35 | 37 |
| d35 | 43 |
| 35 | 53 |

ON December 15, 1890, the appellee instituted this action against the appellants, the surviving heirs of John W. Iliff, deceased, to declare a trust. The averments of the complaint, in substance, are that the plaintiff, in the latter part of the year 1866, brought to the city of Denver a large herd of cattle ; that he employed said John W. Iliff as his agent to assist him in selling and disposing of said cattle and collecting the purchase money therefor ; that he sold one hundred head of said cattle at $20.00 a head to Erastus E. Eastman; that after the cattle had been delivered to Eastman and disposed of by him, and being called upon to settle for the same, he informed plaintiff that he had no money or means of paying for said cattle, except a certain tract of land lying north of the city of Denver, and described as follows: The E. ½ of the N. W. ¼ and the N. E. ¼ of the S. W. ¼, and the N. W. ¼ of the S. E. ¼ of section 20, township 3, south of range 67 West, containing 160 acres. That said land was not worth more than $500, and as said Eastman had no other property or means from which plaintiff could realize the purchase money for said cattle, he agreed with said Eastman to accept said land in payment for said cattle. " That the said John W. Iliff had, as his agent, assisted him in reaching a settlement with said Eastman, and as plaintiff had full trust and confidence in said Iliff, and as plaintiff was at that time departing for Texas, he directed said Eastman to make to said Iliff, and said Iliff to receive from said Eastman a deed for the land aforesaid; that said Iliff agreed to sell said land for plaintiff, and account to plaintiff for the proceeds thereof. That after the departure of this plaintiff for Texas, to wit, on the 4th day of January, A. D. 1867, said Eastman, for the consideration price of said cattle, and in compliance with the agreement that he had made with this plaintiff, did make and execute to said John W. Iliff a deed for the land aforesaid, placing in the said deed the name of John W. Iliff as the grantee. That said deed was recorded in the records of Arapahoe county on the 12th day of July, 1867."

That John W. Iliff neglected and failed to inform the

plaintiff that he obtained said deed, and that he, the plaintiff, had no knowledge whatever of the land having been deeded by said Eastman to said Iliff until the year 1888. Alleges that in 1867, while bringing a large herd of cattle from Texas, of the value of $150,000, they were captured and taken from him by the Indians; that the loss of the cattle bore so heavily upon, and distressed him to such an extent that he became an invalid, and so sick and feeble as to be wholly unable to transact any business for the period of twenty-two years; that the memory of said transaction with said Eastman that occurred prior to his sickness was entirely effaced from his mind, and he had lost all memory of the same during that period, and until said transaction was called to his attention by said Eastman in the year 1888. That in the year 1879 John W. Iliff died, leaving surviving him his wife, now Elizabeth Warren, and three minor children, Willis S. Iliff, Edna Iliff and Louise Iliff, as his heirs. That at the time said land was deeded by said Eastman it was wild and unimproved, and has always remained so and has never been in the actual possession or occupancy of any one, and said John W. Iliff has never denied that he held said land in trust for plaintiff. That no final settlement was ever had between the plaintiff and said Iliff in relation to the agency of said Iliff for plaintiff, including the matter of this land. " That the said John W. Iliff never paid one cent of the consideration that passed to the said Eastman for said land, but that the whole and entire consideration paid to said Eastman and on account of which said Eastman deeded the said land, was paid by this plaintiff."

The defendants, answering, admit that a deed to the land in question was executed by Erastus E. Eastman to John W. Iliff on the 4th day of January, A. D. 1867, but aver that said deed was accepted by said John W. Iliff for the satisfaction of divers large sums of money then and theretofore due and owing by plaintiff to said Iliff, and not under the circumstances or considerations in the complaint mentioned;

deny the material averments of the complaint and plead laches and the statutes of limitations.

Replication denying all new matter in the answer. The court found the issues in favor of plaintiff; that he was the true and equitable owner of the lands as against the defendants, and decreed a conveyance of the legal title to him. To reverse this decree defendants prosecute this appeal.

Messrs. WELLS, MACON & FURMAN and Mr. M. F. TAYLOR, for appellants.

Messrs. STUART, MURRAY & ANDREWS and Messrs. HELM & GOUDY, for appellee.

MR. JUSTICE GODDARD delivered the opinion of the court.

If the averments of the complaint that the deed to the land in question was executed by Eastman to Iliff in consideration of, and in payment for, the cattle sold to him by Adams, is established by the evidence, a resulting trust arose in favor of Adams, in pursuance of the settled doctrine in equity that the beneficial interest or estate follows the consideration and inures to the party from whom the consideration comes. Perry on Trusts, § 126; Pomeroy's Eq. Jurisp. § 1037; Bispham's Eq. § 79; *Dyer v. Dyer*, 1 Leading Cases in Eq. 348; *Davis v. Davis*, 18 Colo. 66.

The first inquiry presented, therefore, is whether the testimony introduced upon this feature of the case is of the character essential to sustain a trust of this description; is it sufficiently clear, unequivocal, direct and convincing? It having been so strenuously urged by counsel for appellants that the evidence in this particular fails to meet the requirements of the law, and is so clearly insufficient to justify the court in declaring the trust in opposition to the deed absolute on its face, we give a brief synopsis of the testimony introduced for this purpose. Robert S. Wilson testifies:

"Eastman said he had disposed of the cows; that he had

got 160 acres of land out here worth $2,000, and would give a deed for that. * * * I think Mr. Adams and myself had some talk about it. I told him that the best thing he could do was to take the land. Mr. Iliff and Adams stood at the desk, at the end of the desk, and Adams said (speaking to Eastman) ' Give John Iliff a deed for the land ; I don't want it in my name, for I am going away, and don't know when I will be back. John, whenever you can get that amount of money out of the land, deposit it for me.' I think Iliff said ' That's all right.' "

Lyman H. Cole testified :

" I was around the Elephant corral in the fall of 1866. * * * Heard some talk after the deal was made. Adams wanted his pay for some cattle that he had sold to Eastman. Eastman wanted him to take some land. * * * Eastman said he had nothing but this land. * * * After the year 1866 I had a conversation with Mr. Iliff about the pay for these cattle that I bought (from Adams) at that time. I paid Iliff some money. He said he wanted money to pay taxes on this land. * * * He said he would like to trade me the land and take my interest in the contract for furnishing the railroad company with beef, because Adams wanted and needed the money out of it. Iliff said it was the land Adams took from Eastman."

James M. Strickler testified :

· " Adams was a large dealer at that time in the territory. Erastus Eastman was a stock salesman for us, and our firm rendered Mr. Adams some assistance in the disposition of some of his cattle, and there was 100 cows traded by Adams to Eastman for 160 acres of land ; remember the transaction. We talked it over at the time, but that is as far as my memory goes."

Richard Shaw testifies :

" Adams sold his cattle here in 1866. Eastman got 100 head of them. * * * I was at the Elephant corral when there was talk about these cows. Mr. Adams and his brother were present, and Rat Eastman and Iliff, and I think Robert

Wilson. * * * Mr. Adams said he didn't want the land, but he wanted the money for his cows; * * * told him he would have to take the land and get what he could out of it. Iliff said he had better take the land."

James B. Cooper testified:

"I knew Erastus Eastman in 1866. About the transaction of Eastman deeding to Iliff—I knew there was a good deal of talk about Rat Eastman trying to get a trade out of Adams for some land down beyond the race track, some land for some cows. * * * One day (in December, 1869) I asked him about Mr. Adams's land, how he got along. He said, 'Mr. Adams has got it all right.' I spoke of the land he got from Rat Eastman. * * * I heard Iliff say the deed was made to him. That he was acting for Adams. At the time we had this conversation I asked Iliff what Adams had done with the land. He said, 'He has it yet.' I said, 'That's right, I would hold it for him.' He said, 'I want to hold it for him.'"

William Roberts testified:

"Adams sold him (Eastman) 100 cows and expected he would get the money for them, but when he came to get the money Eastman told him he didn't have any money, and proposed to trade him 160 acres of land. Adams didn't want the land, * * * but finally told Eastman to make the deed to Iliff. * * * Iliff was there when Adams and Eastman were talking about the sale of these cattle."

There would seem to be, upon the foregoing testimony, but little if any question that the land in controversy was paid for by the cattle sold to Eastman by Adams. Such is the irresistible conclusion unless the statements of these witnesses were mere fabrications.

In addition to the testimony above quoted, that of the plaintiff is full and clear upon the fact of the sale of the cattle to Eastman and the execution of the deed to Iliff in pursuance thereof; but his testimony is sought to be excluded upon the ground that he was disqualified as a witness, under section 4816 of Mills' Statutes, wherein it is provided "That no party to any civil action, suit or proceeding, or person di-

rectly interested in the event thereof, shall be allowed to testify therein, of his own motion, or in his own behalf, * * * when any adverse party sues or defends * * * as the executor or administrator * * * of any deceased person, or as guardian or trustee of any such heir * * * unless when called as a witness by such adverse party so suing or defending * * *."

His deposition was taken by appellants and he was examined by them as to his sanity. On cross-examination he testified, over objection to the transaction in question. By stipulation entered of record all objections to depositions were withdrawn "except objections to competency and immateriality, and that such objections may be urged upon the trial and determined in the final argument of the case." The deposition was offered and read in full by the appellants. Under these circumstances was he rendered competent to testify upon the controlling issue in the case? Having been called as a witness by the adverse parties and examined by them as a witness upon certain matters pertinent to some of the issues in the case, we think that he was thereby rendered competent for all purposes. *Seip v. Storch*, 52 Pa. St. 210 ; *Varick v. Jackson*, 2 Wend. 166 ; *Fulton Bank v. Stafford*, 2 Wend. 483 ; *Thomas v. Irwin*, 90 Tenn. 512 ; *Am. Savings Bank v. Harrington*, 34 Neb. 597 ; *Boyd v. Conshohocken, etc.*, 149 Pa. St. 363.

There was also produced in evidence a power of attorney, executed by the plaintiff Adams, to John W. Iliff, empowering him to buy and sell real estate or personal property, etc., which was recorded at the same time the deed from Eastman to Iliff was recorded. We think that the giving of the power of attorney by Adams to Iliff, empowering him to buy and sell real estate, and the recording of that instrument at the same time the deed was recorded, it appearing that Adams had no other real estate in the county at the time, is a circumstance of considerable significance, and might well be taken as corroborative of the claim of plaintiff that the real estate in question was conveyed to Iliff in trust. Upon a

careful examination of all the evidence which bears with more or less force upon the vital question, to wit: From whom did the consideration move upon which the deed to Iliff was executed? and, reading it in the light of the able and searching analysis of counsel, we think it supplies that quantum of proof that the law requires in cases of this character.

But it is insisted that, if true, the testimony proves too much and tends to establish an express trust that is not available under the statute of frauds. This contention rests upon the assumption that the trust was created by the agreement of the parties, and that the fact that the purchase price was paid by Adams was thereby divested of all its force as an operative factor in determining the character of the trust. Such assumption is unwarranted. The payment of the consideration for the land by Adams being essential to the existence, and controlling as to the character of the trust, the agreement of the parties or the consent of Iliff to hold and dispose of the land for the benefit of Adams does not in any way affect or change its nature. As was said in the case of *Cotton v. Wood*, 25 Ia. 43, in passing upon this identical question: .

" It cannot be that the consent of the trustee to hold the title for the benefit of the *cestui que trust*, or an agreement so to do, in case of a resulting trust, will change its character. By the agreement the trustee simply assents to an obligation imposed by the law ; the trust would exist without the agreement by operation of law. The agreement cannot destroy the effect of the conditions under which the law presumes the estate is held by the trustee."

And, as also said in Perry on Trusts, § 134: " A trust results from the acts, and not from the agreements of parties, or rather from the acts accompanied by the agreements." *Knox v. McFarran*, 4 Colo. 586 ; *Lipscomb v. Nichols*, 6 Colo. 290 ; *Hidden v. Jordan*, 21 Cal. 93 ; *Lundy v. Hanson*, 16 Colo. 267 ; *Boyd v. M'Lean*, 1 John. Chancery, 582 ; *Page v. Page*, 8 N. H. 187 ; *Millard v. Hathaway*, 27 Cal. 119 ; *Van Syckle v. Kline*, 34 N. J. Eq. 332 ; *Blodgett v. Hildreth*,

103 Mass. 484; *Reynolds v. Sumner*, 126 Ill. 58: Bispham's Prin. of Eq. § 83.

In the latter case, at page 69, the court uses this language :

"Therefore, if Sumner entered these public lands with land warrants owned by Reynolds, or by Reynolds and himself, and took the legal title in his own name, a resulting trust was thereby created in the lands entered in favor of Reynolds, in proportion to his interest in the land warrants, without regard to the express contract between them."

And in the 103 Mass., *supra*, it is said :

"The trust results from the purchase and payment of the consideration by or for one party, and the conveyance of the land to another. * * * The implication of a trust from these facts may be overcome and disproved, or corroborated, by any oral or written testimony showing the circumstances of the transaction, and the expressed or probable intentions of the parties. Their admissions at the time or afterwards are competent to be proved. So also are their agreements ; but agreements not in writing have no force otherwise than as admissions tending to destroy or confirm the inference otherwise deducible from the facts of payment of the consideration and deed to a third party. The trust results only from that inference."

The appellants offered no evidence on the trial of the cause in support of the allegation in their answer that the land was conveyed to Iliff in satisfaction of an indebtedness due to him from Adams ; and the only affirmative defenses relied on to defeat the enforcement of this trust are the statute of limitations and the doctrine of laches. In support of this contention counsel insist that if the trust be held to be a resulting trust, that a right of action accrued immediately upon the execution of the deed to Iliff. But an answer to this is found in the fact that the trust was as well a consentive and continuing one, and that the holding by Iliff was fiduciary and not adverse. While the statute of limitations does run against a resulting trust, or, more properly speaking, a constructive trust which is initiated by and is originated through

the wrongful conduct of the trustee, from the date of its inception, it does not apply to that class of resulting trusts that are created with the consent of the trustee and *cestui que trust*. In the latter class no right of action accrues until the trust is repudiated, or in some manner disavowed by the trustee, and the knowledge of such repudiation or disavowal brought home to the knowledge of the *cestui que trust*.

As the doctrine is expressed in *Kane v. Bloodgood*, 7 Johnson's Chancery, 89:

" Those *trusts* which are mere creatures of a court of equity, and not within the cognizance of a court of law, are not within the statute of limitations. As long as there is a continuing and subsisting trust, acknowledged or acted on by the parties, the statute does not apply; but if the trustee denies the right of his *cestui que trust*, and the possession of the property becomes *adverse*, lapse of time, from that period, may constitute a bar in equity."

As stated in *Sheldon v. Sheldon*, 3 Wis. 699:

" The ten years' statute of limitation does not apply to a trustee who has continued during that time to act as trustee, with the consent of the *cestui que trust*, and all others interested in the trust property.

" The ten years' statute of limitation, applicable to cases of trust, etc., commences to run on his denial of the trust, or by setting up a claim to the property in his own right. So long as he claims to hold the property in a fiduciary capacity, and performs the duties of his trust properly, there is no cause for a bill for relief against him."

*Reynolds v. Sumner, supra*, was a case of a resulting trust. The court said:

" When possession of trust property is taken by the trustee, under the trust, it is the possession of the *cestui que trust*, whether the trust be express or implied, and cannot be adverse until the trust is openly disavowed or denied, and this fact is brought home to the knowledge of the *cestui que trust*."

In *Cole v. Noble*, 63 Tex. 432, Willie, C. J., speaking for the court, says:

" It is common learning that in cases of resulting trusts, so long as the trust relation is admitted and there is no adverse holding by the trustee, or any one claiming under him, no lapse of time will bar the *cestui que trust.*" *Shorter v. Smith,* 56 Ala. 208 ; *Murphy v. Murphy,* 80 Ia. 740 ; *Butler v. Hyland,* 89 Cal. 575 ; *Thomas v. Brinsfield,* 7 Ga. 154 ; *Love v. Watkins,* 40 Cal. 547 ; *Dow v. Jewell,* 18 N. H. 340 ; *Taylor v. Dawson,* 3 Jones Eq. (N. C.) 90 ; *Riddle v. Whitehill,* 135 U. S. 621.

But counsel for appellants contend that the payment of taxes and the redemption of a portion of the land from the tax sale by Iliff, in his own name, constitute a repudiation of the trust. Under the circumstances of this case we do not think these facts can be held to have that effect. If, as we have seen, Iliff held the title to the land in trust, although not expressly obligated to pay the taxes and thus preserve the trust estate, if such was not his implied duty, his voluntarily doing so will be presumed to have been done to preserve the trust estate, rather than with the intent and purpose of defrauding his *cestui que trust.*

" It is a fundamental principle that equity imputes an intention to fulfill an obligation * * * where one acquires * * * property, and is under some obligation in respect thereto to another, though in acquiring the same he expressed no intention of fulfilling the obligation, equity will impute such an intention." Beach Mod. Eq. Jurisp. § 24.

The payment of taxes and the redemption of the land from the tax sales by Iliff, being consistent with his duty as trustee, did not constitute such a hostile holding or claim on his part as would evidence a repudiation of his trust.

" The disloyal acts * * * must be open, continued and notorious, so as to preclude all doubt as to the character of the holding, or the want of knowledge on the part of the owner." *Zeller's Lessee v. Eckert,* 4 Howard, 289 ; *U. S. v. Taylor,* 104 U. S. 216.

Nor can the appellants avail themselves of the provisions of section 2187 of the General Statutes, by reason of the pay-

ment of these taxes. The " color of title " therein referred to must arise out of some conveyance purporting to vest in the grantee an interest in his own right adverse to the true owner, and not from one that constitutes him a trustee of the title for the use and benefit of such owner. And, furthermore, such claim or color of title must be made in good faith.

It seem to us too clear for argument that neither of these essential requirements can exist in the case of a trustee holding the title for another. He cannot in good faith claim color of title for himself by virtue of a conveyance that clothes him with a trust. " The good faith, required by the statute, in the creation or acquisition of color of title, is a freedom from a design to defraud the person having the better title." *Mc-Cagg v. Heacock*, 34 Ill. 476.

It remains to consider whether plaintiff is chargeable with such laches as will preclude him from invoking the aid of a court of equity to establish the trust in question. It is difficult to define what constitutes a stale equity. We gather from the numerous authorities cited on this question that no exact definition can be given ; but it seems to be settled that length of time alone is not sufficient to justify the court in refusing equitable relief. The circumstances under which the delay occurred, together with the lapse of time, must be such as to impute negligence to the party who seeks relief.

" An essential element in a case to constitute laches is that the party whose delay is in question shall have been blamable therefor in the contemplation of equity ; that he ought to have moved before, if he desired the peculiar and discretionary relief which courts of equity afford. There must, therefore, have been knowledge, actual or imputable, of the facts, which should have prompted a choice either to diligently seek equitable relief or thereafter to be content with such remedies as a court of law might afford." *Bausman v. Kelley*, 38 Minn. 197 ; *Paschall v. Hinderer*, 28 Ohio St. 568 ; *Earl of Beauchamp v. Winn*, 6 L. R. E. & I. App. C. 223 ; *Neppach v. Jones*, 20 Ore. 491 ; *Ripley v. Seligman*, 88 Mich. 177 ; *Pairo v. Vickery*, 37 Md. 467.

The plaintiff introduced evidence to show that by reason of the loss of a large herd of cattle in 1867, and the consequent anxiety and worry that attended an attempt on his part to collect a claim therefor from the government, in the year 1870 he was stricken down, and not only suffered greatly from impaired health, but was afflicted with a phase of insanity known as amnesia, or a loss of memory; that he entirely lost all recollection of events occurring prior thereto, and on account of his physical and mental condition was unable to attend to business; that the transaction in relation to this land was entirely effaced from his memory and that he remembered nothing in relation thereto until in the year 1888, when his attention was called to it in the city of Albuquerque, by Eastman. A large number of witnesses were introduced and testified to his mental and physical condition, some by deposition and others orally, upon the witness stand; among the latter two experts on insanity.

While the evidence so introduced is conflicting, it largely preponderates in favor of plaintiff's contention, and the court below found as a conclusion of fact that the plaintiff came within the class exempted from the operation of the statute of limitations as insane persons. The finding of the court upon this fact comes clearly within the numerous decisions announced by this court, that where the trial court passes upon the credibility of witnesses and the weight of testimony, that its finding of facts will not be disturbed in the appellate court unless the same is manifestly against the weight of evidence. We must therefore accept such finding as conclusive, and therefore the condition of plaintiff would exempt him from the doctrine of laches, even if the doctrine may be invoked by appellants against the enforcement of a trust of this character. *Martin v. Neblett*, 86 Tenn. 383; *Miles v. Wheeler*, 43 Ill. 123; *Stephens v. Martin*, 85 Tenn. 278.

This case is also unaffected by those other equitable considerations that lead courts of equity to refuse relief on the ground of laches. No rights of third parties have intervened. The land in question has, during all these years, remained

open and unoccupied, and no expenditure in improvements
has been made thereon by appellants or their ancestor, and
in no way has the delay operated to their prejudice. The
errors assigned upon the admission and rejection of evidence
are, we think, without merit. Upon the view we have taken
of the question of laches, the testimony of the witness Reed
as to the reasons given by plaintiff for his delay in bringing
the suit is immaterial. The refusal to permit Mrs. Warren
to testify to her good faith in paying the taxes and to the
declarations made by Iliff to her during his lifetime, under
the circumstances of this case, was correct. The testimony
sought to be introduced was clearly inadmissible.

It is finally asserted by counsel for appellant that if the de-
cree can be maintained upon other grounds, that it is errone-
ous in not decreeing an account of the amount of taxes paid
by appellants and their ancestor. It is admitted that no such
claim was made in the pleadings nor in any way asked in the
court below. This question, therefore, is not presented by
the record, and cannot be considered on this review. We,
however, agree with counsel that upon an affirmance of this
decree appellants are entitled to an accounting for the amount
of taxes paid by them and their ancestor, and to be reim-
bursed for all sums so paid in excess of the money, if any,
received by Iliff for plaintiff, and that the payment of the
same should be made a condition precedent to the divestiture
of the title.

We have given this case that careful consideration that its
importance demands, and in our investigations we have been
greatly aided by the elaborate and able briefs and oral argu-
ments of the respective counsel. Every view of the contro-
versy has been elaborated and illustrated by argument and
precedent, and we believe we are well advised upon the ques-
tions involved, and that the views announced are consonant
with well settled principles and the weight of authority.

The rulings of the court below being in conformity with
them, and no error in the trial of the cause appearing, the
decree of the court below is accordingly affirmed, but upon

the condition that it shall not take effect as to the convey-
ance of the title until the amount found to be due appellants,
if any, on account of the payment of taxes, shall be first paid.
The cause is therefore remanded, with directions to the court
below to take such an accounting between the parties as a
condition precedent to the enforcement of this decree.

*Affirmed.*