LESTER ROYAL, *alias* LESS ROYAL, v. STATE.

170 So. 450.
Opinion Filed December 12, 1936.

*W. J. Sears, Jr., A. Dana Brown* and *O. E. Falls,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell,* Assistant Attorney General, for the State.

DAVIS, J.—The plaintiff in error, hereinafter referred to as defendant, was informed against in an information containing three counts. The first count charged the defendant with being a principal in the second degree to the forgery of a Western Union draft in the sum of $7500.00, alleged to have been perpetrated by one R. H. Bullock, with intent to injure and defraud the Western Union Telegraph Company. The second count charged the defendant as an accessory before the fact to the forgery, and the third count charged the defendant as an accessory after the fact to such forgery. The defendant was joined in the information with the alleged principal and other alleged accessories.

The principal defendant, Bullock, pleaded guilty and was adjudged guilty by the Court but not sentenced prior to the trial of the defendant Royal, which was had pursuant to an order of severance. This writ of error· is to the judgment and sentence of the Criminal Court of Record of Palm Beach County finding the defendant Royal guilty on two counts of the information and sentencing him to ten years imprisonment on the second and third counts.

The principal, R. H. Bullock, who pleaded guilty of the forgery, had been manager of the Western Union office at West Palm Beach for four years prior to October 31, 1934, which is the day alleged in the information as the time of the commission of the forgery. He testified that he had authority during that time to sign authorized wires of the Western Union for the transfer of money and that on the date in question he made and signed an unauthorized draft of the tenor and in the amount described in the information.

The circumstances leading up to the alleged forgery were testified to as follows by Bullock: On October 28, 1934, Bullock and Royal had discussed the prospects of making money in a liquor deal. 'Bullock explained to Royal that he, Bullock, was short in his accounts with the Western Union, his employer, and with the Kiwanis Club, of which he was Treasurer, and that in order to escape from his predicament, it was necessary for him to make some money at an early date so that he could cover his shortage before they were discovered.

After some discussion with Royal at the Burbridge Hotel in Jacksonville on Sunday night (which was October 28th) Bullock and Royal decided that the best way for Bullock to get money in order to "turn" the liquor deal was for Bullock to forge and cash Western Union Money Order drafts, which he, Bullock, was authorized to sign. The

draft that Bullock actually drew and cashed was made out to one B. K. Hinson, the endorsement of Hinson's name thereon being the forgery.

There was other testimony to the effect that after Bullock had forged and cashed the draft for $7500.00, he and one Dozier Drawdy made arrangements to fly by plane from West Palm Beach to Jacksonville to meet the defendant Royal. On the way there they had engine trouble and arranged for Royal to meet them at Flagler Beach, which Royal did. Royal then took Drawdy and Bullock in his car, and on the way to Jacksonville Bullock gave Royal more than $4,000.00 of the $7,500.00 that he had realized as a result of the forgery. After reaching Jacksonville, defendants Royal and Drawdy made arrangement for Bullock and Drawdy to board a ship and go to Nassau. A couple of weeks later Bullock talked with Royal in Nassau, and Royal told him that the officers were searching for him, Bullock, and that he, Royal, had heard that the reward offered for Bullock's apprehension had been increased from $500.00 to $1,000.00.

In opposition to the state's testimony, which consisted principally of the testimony of Bullock, three witnesses for the defendant testified as to an alibi of the defendant covering the period of from 11:00 o'clock on the morning of October 28th, to 5:30 in the afternoon of October 29, 1934. Their testimony was to the effect that the defendant Royal was at Kingsland, Georgia, during that time. Three witnesses for the defendant also testified as to the defendant's whereabouts on the night of October 31, 1934, and the day of November 1, 1934. According to their testimony, the defendant spent the night of October 1, 1934, at the business place of one A. Rabens, in Jacksonville, and spent the day of November 1, 1934, on a fishing boat.

The co-defendant, Dozier Drawdy, who had been convicted under the information several weeks prior to the trial of Royal, testified for Royal that Bullock and he attempted to see the defendant Royal in Jacksonville on October 28, 1934, but did not see him, because said defendant was not in the City of Jacksonville at that time. According to Drawdy, after the forgery was committed by Bullock, he and Bullock left West Palm Beach by aeroplane to go to Tampa, Florida, but they spent the night instead in Arcadia, Florida, and the following morning proceeded to Flagler Beach. Drawdy further testified that neither he nor Bullock saw the defendant at Flagler Beach or Jacksonville on this trip, and that on the following day they took a boat for Nassau.

The defendant Royal testified in his own behalf that he did not know of any forgery in West Palm Beach until several weeks later when he was approached by the Superintendent of the Western Union Telegraph Company in Jacksonville; that he never did go to Nassau during the month of November, 1934, and that he saw R. H. Bullock, the forger, for the first time in his life on the day that he, Royal, was arraigned in the case, which was on April 30, 1935.

Royal further testified that on October 28, 1934, at 11:00 o'clock in the morning, he left Jacksonville, Florida, for Kingsland, Georgia, where he spent the rest of that day and night and the next day until about 5:00 o'clock. He denied that he had seen either Bullock or Drawdy in Jacksonville on October 28, 1934, and stated that he could not have seen them there at that time, because he was not in the city. He further testified that on the night of October 31st, he was at the place of A. Rabens, in Jacksonville, and that he spent the day of November 1st following on a

fishing boat; that upon his return from the fishing trip of October 31, 1934, he went to bed in his hotel in Jacksonville and spent the night there and saw neither Bullock nor Drawdy at any time on October 31, 1934.

Bullock, as the principal witness for the state, had testified that he had arranged to meet Royal at Ormond Beach, Florida, after a telephone call made by Drawdy from Bullock's home in West Palm Beach to defendant Royal at the Burbridge Hotel in Jacksonville. This was on October 27th, the day before the alleged meeting which Bullock testified took place between him and Royal on the night of October 28th at the Burbridge Hotel.

Over the objection of the defendant Royal, the State was allowed to place in evidence certain telephone tickets made by telephone operators which purported to show certain calls made to the Defendant Royal, said telephone tickets having been identified by the telephone operators who handled the calls, but said telephone operators being unable to identify either the maker or the receiver of the calls, and being unable to testify of their own knowledge as to the identity of the voices of the persons by whom the calls were purported to have been made. The admission in evidence of these telephone tickets was strenuously objected to by the defendant as being hearsay and incompetent. The court's ruling that they should be admitted in evidence forms the basis of the principal assignment of error.

The telephone tickets in controversy were part of the system of records kept by the telephone company in connection with its long distance service. They purport to show, as of the time a long distance call is made, the city where the call originates, the name given at that place by the person making the call, the city where the call is received, and the name of the person purporting to receive it,

and special details concerning the nature of the service, and the toll charged or paid therefor. The information written on such telephone tickets is derived from what is told telephone operators at the time the call is handled. The ticket itself is a company record designed to preserve such information for the purpose of the company's business. The information on the tickets is admittedly made up only from what is transmitted over the wires at the time of the call, to and from the telephone operator as to the identity of the sender and receiver of the call, and only in rare instances can the controlling operator be in a position to testify from any personal knowledge as to identity of the voices of the persons by whom the calls recorded, are made or received.

Ordinarily the rights of an individual cannot be affected by written statements of persons who act in an unofficial capacity in respect to matters to which he is a stranger. As to him such writings are *res inter alios acta* and inadmissible. Again such writings, as unsworn statements of living persons who might be produced in court as witnesses, are inadmissible as hearsay. And the same objections would be applicable where the writing or memorandum is as to a second hand fact which the witness would be prohibited from testifying about as a witness,. because not known to him except by hearsay. State Bank of Pike v. Brown, 165 N. Y. 216, 59 N. E. Rep. 1, 53 L. R. A. 513, and note; State v. Rozeboom, 145 Iowa 620, 124 N. W. Rep. 783, 29 L. R. A. (N. S.) 37; Seaboard Air Line Ry. Co. v. Railroad Comm'rs, 86 S. C. 91, 67 S. E. Rep. 1069, 138 A. S. R. 1028; Terry v. Birmingham Nat'l Bank, 92 Ala. 599, 9 Sou. Rep. 299, 30 A. S. R. 87; Morris v. Columbian Iron Works, etc., 76 Md. 354, 25 Atl. Rep. 417, 17 L. R. A. 851.

But a written memorial made at the time of a transaction,

and in the presence, actual or constructive, of the parties, is evidence, and admissible, in order to strengthen one side or the other, as the memorial may corroborate the one or the other. It is immaterial who made the memorial, so that it was made at the time of the transaction in the actual or constructive presence of the parties at variance.

Thus, memoranda in writing, such as tickets, registers, manifests, cards and the like employed as part of a system of business, when made or executed contemporaneously with a transaction in dispute and in the actual or constructive presence of the parties to it, become evidentiary landmarks by which to correct, adjust and aid the imperfections and uncertainties of memory and thereby supply convincing evidence of the details of the transaction in controversy. And inasmuch as such writings were made out as a lineament of the transaction in dispute, they are part of the *res gestae* of such transaction, and are accordingly admissible as such to illustrate, or corroborate it, after testimony as to the transaction itself has been first given in evidence by a party claiming to have been party to the transaction at the time the memorial in connection with it was made. Reviere v. Powell, 61 Ga. 30, 34 Am. Rep. 94; Reynolds v. Sumner, 126 Ill. 58, 18 N. E. Rep. 334, 9 A. S. R. 523, 1 L. R. A. 327; Beck v. Ulrich, 13 Pa. St. 636, 53 Am. Dec. 507; Note 125 A. S. R. 847.

In this case it became material, in the plans of the prosecution, to attempt to prove the fact of telephone conversations alleged to have been had with the defendant Royal by other parties  The other parties to the alleged conversations were called and testified that such conversations were actually had. This testimony established the necessary preliminary legal predicate for introducing as corroborative proof thereof, the telephone tickets which were obviously

made by the telephone operator in the constructive presence of both parties to the telephone conversation that actually took place. The tickets, as memoranda, were accordingly admissible in evidence to spuport and corroborate the testimony of the witnesses whose testimony was relied on to establish the transaction to which such memoranda related, viz.: the telephone conversations alleged to have been had by such witnesses with the defendant Royal as the other party to the same.

Whether or not defendant Royal was the other party to the telephone conversations depends not upon the evidentiary value *per se* of the challenged telephone tickets, but upon the veracity of the witnesses who testified that such conversations were actually held with Royal to their own knowledge—the telephone tickets being mere memorials of what happened as made in the constructive presence of the parties who were telephoning and simultaneously with the act of telephoning as testified to. So the tickets were not inadmissible as *res inter alios acta,* nor as hearsay.

It was undoubtedly technical error for the trial judge to have permitted the state's most important witnesses to be called back to the stand to merely reiterate in rebuttal, the identical testimony they had already given on their examination in chief. But trial procedure with reference to the re-examination of witnesses under circumstances such as developed at this trial is so largely a matter within the sound discretion of the trial judge to permit or refuse, depending upon the circumstances, that reversal for such technical error of procedure will not be directed unless shown to have resulted in some actual prejudice to the rights of the accused. Crouch v. Commonwealth, 238 Ky. 5, 36 S. W. (2nd) 653; Shell v. Commonwealth, 245 Ky. 535, 53 S. W. (2nd) 954; Day v. State, 62 Tex. Cr. 448, 138 S. W. 130;

Corliss v. State, 12 Okla. Cr. 526, 159 Pac. Rep. 1015. We cannot say from the record before us that reversible error was committed in this case in the particulars complained of, especially in view of Section 4499 C. G. L., 2812 R. G. S.

Other assignments of error have been examined but require no detailed discussion.

The evidence, for the state, if believed by the jury to be true, was legally sufficient to sustain the verdict of guilty on the second and third counts of the information.

The jury instruction complained of was not reversible error within the holding of Messer v. State, 120 Fla. 95, 162, Sou. Rep. 146, when the charge as a whole is considered in connection therewith. We reiterate, however, our disapproval of any form of charge to a jury in a criminal case that is likely to be construed by the jury as a direction to them to disparage or disregard the argument of accused's counsel as a consideration to be taken into account by them in connection with their weighing the evidence upon which accused claims that no verdict of guilty should be rendered.

Affirmed.

WHITFIELD, C. J., and ELLIS, TERRELL, and BUFORD, J. J., concur.

BROWN, J., dissents in part.

BROWN, J. (dissenting in part).—The second question involved, as correctly stated in the brief for plaintiff in error, is as follows:

"Is a telephone ticket, containing the alleged names of the maker and receiver of a call, made by a telephone operator at the time a telephone call was placed, admissible in evidence to prove the *identity* of the maker and receiver of said call, the operator knowing neither of said parties and being unable to identify their voices?"

As I see it, this question should be answered in the negative. Such telephone ticket, made under the circumstances stated, is not *per se* proof of the identity of the maker or receiver of the call. But in this case the telephone tickets were properly admissible as evidence tending to prove that at the time shown thereon certain telephone calls were made between certain originating and receiving points, *purporting* to have been made by and to the names given to the operator and written on the tickets at the time. There was other evidence tending to prove the identity of the makers and receivers of these calls. The tickets, supported by the testimony of the operators, were certainly admissible in evidence, but in and of themselves they did not prove the identity of the parties making the calls. It would be very easy for a person making a telephone call to tell an operator, who did not know him or his voice, that he was another party, and if such a statement when placed on a ticket by a telephone operator could be received as proof of the identity of the person making the call, serious injustice might frequently be done to entirely innocent parties. Yet it cannot be denied that such evidence is sometimes of very high value and significance as corroborative or circumstantial evidence as the case may be. This was strikingly illustrated in the case against Lieutenant Becker which was tried in New York City some twenty or more years ago.

It appears therefore that the trial court might well have given the charge requested by plaintiff in error to the effect that the telephone tickets were not to be considered as showing that the persons whose names appeared therein were the persons who talked, but as evidence that the Telephone Company handled such calls at the time specified on the tickets. The court amended this charge, and gave it as amended. As so amended the charge was substantially cor-

rect, but subject to being construed by the jury to mean that the tickets might in and of themselves be considered as some evidence of the identity of the makers and receivers of the calls.

The most serious question in the case, as to the conviction under the second count, was whether the defendant Royal did "counsel, hire and otherwise procure" Bullock to commit the forgery. The State relied upon the testimony of Bullock to prove this. His testimony on this point was probably sufficient to justify submitting the question to the jury for their determination, but it was not very strong nor convincing and indicates that the scheme of raising money by the forgery of Western Union drafts originated with Bullock himself.

Then there is the matter of the court's permitting the State's most important witnesses to be called back and to reiterate in rebuttal the same testimony already given on their direct examination.

On the whole I think this man should be given another trial.