[No. 6089.]

THE MOUNTAIN WATER WORKS CONSTRUCTION COMPANY v. HOLME.

1. **Subscription to Corporate Stock — Contract Construed —** The appellant corporation, at its organization meeting, April 29, 1889, voted to pay all assessments on $15,000.00 of its capital stock subscribed by Holme, and upon a like amount subscribed by Allen, and that in consideration thereof Holme and Allen should pay interest on each assessment from the time it was made, and assign to the company a certain patent. The assignment was made accordingly, Holme subscribed for 200 shares of the stock, and was charged in the books of the company with

$20,000.00, the amount of this subscription. He paid assessments on $5,000.00 of this subscription, being the full par value of fifty shares of stock, as they were called, and received a certificate therefor. January 31, 1891, the ledger of the company showed a balance against Holme of $15,000.00, for which he on that day executed his promissory note to the company, payable at one day, with interest. The construction account of the company was debited with $15,000.00 for the patent, from Holme, and his account was closed by construction. Bills receivable on the same books was debited with construction, $15,000.00, and construction credited with the same amount. The stock ledger, under date of October 7, 1891, showed the issuance to Holme of a certificate, No. 32, for 150 shares, and No. 33, for 50 shares. Certificate No. 32 was never signed by the president of the corporation, nor taken from its stub, and later entries, made without the knowledge of Holme, attempted to show that it was canceled. But at every meeting of the stockholders of the company, Holme attended, and, without objection, voted on 200 shares. In February, 1891, certificates were filed in the proper public offices, signed and sworn to by the president and directors of the company, declaring that the whole capital stock of the company had been subscribed and paid in cash. Holme, in the winter of 1902-1903, rendered an account against the company, claiming credit for certain dividends and showing a balance due from him. The company thereupon assumed the position that Holme never having paid his note, had abandoned all right to the stock. Pending negotiations for a settlement, Holme died. His executrix thereupon tendered the balance due on the note, after deducting the dividend, and demanded the stock.

On her bill for an account and to be declared the owner of the 150 shares, it was held that the resolution of April 29, 1889, when accepted by Holme and Allen, became a contract; that the advances made by the company paid for the stock; that the note was to be regarded as given, not for the stock, but in evidence of the indebtedness created by the advancements; and that, the executrix having paid the balance due on the note, after deducting the dividends earned upon the stock, was entitled to be acknowledged as the holder of the 150 shares.—416-424)

2.  **Corporations—Contract with Subscriber to Stock—Validity**—A contract between a corporation and a subscriber to its stock, fairly made and upon consideration, by which the corporation agrees to advance to the subscriber the assessments

which may be made upon his shares, is, as between the corporation and the subscriber, a valid transaction.—(426, 427)

3. ——Stock—Certificate Not Necessary to Title—The certificate issued by a corporation is not the stock, but merely evidence of it. The title may be complete and may be established by other evidence, though the certificate is withheld.—(428)

Corporate stock is a chattel, and, except as to third persons, the property therein may pass, though the seller retains possession until payment therefor.—(431)

4. ——Stockholder—Payment For the Stock Not Necessary to the Character—It seems that, under Mills' Stats., sections 480, 486 (Rev. Stats., §§ 850, 873), a subscriber who has not yet paid for his stock is nevertheless a stockholder.—(430, 431)

5. Evidence—Corporate Books—Evidence Against Corporation—Entries made in the books of account of a corporation, its stock books and records of proceedings, of which there was no concealment, the books being at all times open to the inspection of the directors and stockholders and which accord with the action and conduct of the officers and directors, at the time and afterwards, are evidence against the corporation, even in favor of the secretary under whose direction the entries were made.—(425)

Entries contrary to the fact, made without the stockholder's knowledge, do not affect his rights, e. g., an entry assuming to cancel his stock.—(432)

6. ——Corporate Certificate Filed in Public Office is evidence against the corporation of the full payment, therein declared, of its corporate stock.—(425)

7. Equity — Jurisdiction — A shareholder in a corporation once recognized as such, but whose right is afterwards unjustly denied by the corporate officials, may maintain a bill in equity to compel recognition thereof, and for an account of what is due him by reason of his status. He is not to be remitted to an action at law.—(434)

8. Abandonment—A Question of Intention, and must be established by clear and unequivocal evidence.—(438)

The creditor is not to assert, as against the debtor who has never denied the debt, nonpayment thereof for the lapse of the statutory period, as an abandonment of his rights to corporate stock, for which the debt was contracted.—(436)

9. Statute of Limitations—A Personal Privilege—The debtor may plead the statute or waive it at his pleasure. No third person can plead it for him.—(436)

10. ——When the Statute Begins to Run—As between a cor-

poration and one whose subscription to its stock it has accepted and whom it has acknowledged as a stockholder, the statute does not begin its course till the corporation has denied his right to the stock and brought this repudiation of his right to his notice.—(440)

11. **Costs—In Equity Causes,** are largely in the discretion of the court. A judgment therefor will not be reviewed unless manifestly erroneous.—(441)

The record examined and the dismissal of the plaintiff's cause as to certain defendants, without allowing them costs, sustained.—(441, 442)

*Appeal from Denver District Court* — Hon. FRANK T. JOHNSON, Judge.

Mr. GERALD HUGHES for appellant.

Messrs. DINES & HOLME for appellee.

Mr. JUSTICE MUSSER delivered the opinion of the court:

On March 29, 1889, the Citizens' Water Company, hereinafter called Citizens' company, was incorporated. Its capital stock was fixed at $3,000,-000.00, divided into thirty thousand shares of the par value of $100.00 each. Seven directors for the first year were named in the certificate of incorporation, and the objects of the company were to construct and operate water works for supplying the city of Denver, its inhabitants and others with water.

On April 29, 1889, the Mountain Water Works Construction Company, hereinafter called Construction company, was incorporated by five of the directors of the Citizens' company. Its capital stock was fixed at $500,000.00 divided into five thousand shares of the par value of $100.00 each. Later the capital stock was increased. The incorporators were named as the directors for the first year, and its objects were to build and construct reservoir and water works, and to lay water mains, pipes and conduits for collecting and distributing water. On April 29, the board of

directors of the Construction company met and organized. At that meeting, a resolution, or motion was passed which was as follows:

"That this company will pay all assessments upon the sum of $15,000.00 of the capital stock of this company subscribed for by Charles P. Allen, and also all assessments upon $15,000.00 of the capital stock of this company subscribed for by Richard Holme; and that, in consideration thereof, the said Allen and the said Holme shall each pay interest on all such assessments against them respectively from the time each assessment is made at the rate of eight per cent. per year; and in consideration of such advancements by this company of said assessments, the said Charles P. Allen and Richard Holme are to assign, transfer and set over to the Citizens' Water Company the sole and exclusive right to use the patent issued to Charles P. Allen for the manufacture, sale and use of certain wooden conduits, iron bands and clips, as is more particularly described in the said patent and the specifications thereof, in the counties of Arapahoe, Jefferson, Douglas, Park, Chaffee and Lake in the state of Colorado, and also in any other place in the state of Colorado where the Citizens' Water Company may desire to use the same in connection with its own system for supplying the city of Denver, the inhabitants thereof, the additions thereto and the suburbs thereof with water."

The attorney of the company was directed to see that the proper assignment and transfer of the patent was made. On May 2, Allen conveyed a half interest in the patent, mentioned in the resolution of April 29, to Richard Holme, covering the state of Colorado, and on May 3, Holme and Allen transferred the patent to the Citizens' company, as provided in the resolution. These transfers were duly recorded in the record of transfers of patents in the

United States patent office. This patent was of considerable value to the company, and was kept, used and enjoyed by it at all times after the transfer to it, as well as by its successor, the Denver Union Water Company. On April 30, 1889, various persons subscribed for the capital stock of the Construction Company in the aggregate amount of five thousand shares, being all of the capital stock, and among them was the subscription of Richard Holme for two hundred shares. The subscriptions to the capital stock of the Construction company were paid, from time to time, by the subscribers, as assessed or called for by the directors. At each of these calls, Holme paid the assessment on fifty shares until these fifty shares were fully paid for by him in cash, when a certificate was issued to him therefor. On the first page of the journal of the Construction company, under date of May, 1889, the various subscribers to the capital stock were charged with their subscriptions, and among them appears Richard Holme, charged with two hundred shares, of the par value of $20,000.00. In the ledger of the company, under date of May 1, 1889, Mr. Holme is charged with capital stock to the amount of $20,000.00, and is credited by various items of cash paid at different times to and including August 15, 1890, aggregating $5,000.00 and showing a balance of $15,000.00. This balance of $15,000.00 was, under date of January 1, 1891, carried down and charged in the ledger to Mr. Holme. Mr. Holme executed his promissory note for the sum of $15,000.00, dated January 1, 1891, and payable one day after date with interest at the rate of eight per cent. per annum until paid. The Citizens' company and the Construction company appear to have occupied the same office, and some of the officers of one were officers of the other, and this note remained in the vault in the office, was listed among

(27)

the assets of the Construction company and was produced at the trial by the cashier of the Denver Union Water Company, who found it in a safe marked "Citizens' Water Company," among other papers of the Construction company.

Under date of January 3, 1891,. on page 46 of the journal of the Construction company, is an entry of Construction to Sundries of $30,000.00, consisting of Charles P. Allen, for use of patent pipe, $15,-000.00; Richard Holme, for use of patent pipe, $15,-000.00, with a notation "as per contract and resolution of the board April 29, 1889." And in the ledger, under the same date, Richard Holme was credited by Construction, $15,000.00, from page 46 of the journal, and Construction was debited to Allen and Holme, from page 46 of the journal, $30,000.00. The account of Allen does not appear in the record, though the evidence shows that he was credited with $15,000.00 by Construction. On page 52 of the journal, under date of May 21, Bills Receivable was charged with $30,000.00 to Construction, for the note of Richard Holme for $15,000.00, with a notation that the note was for stock; also for a note of Allen for $15,000.00, and on the same date, Bills Receivable was debited with Allen and Holme $15,000.00 each from page 52 of the journal, and Construction was credited by the two items of Bills Receivable, each for $15,000.00, from the same page. These entries show that Holme had purchased two hundred shares of the capital stock for $20,000.00; that he paid $5,-000.00 in cash; that his account for capital stock was closed and that the company held his note for $15,-000.00. On November 8, 1890, Holme was appointed to act as secretary *pro tem.* until further order of the board, and on February 26, 1891, he was elected secretary of the company, which position he appears to have occupied until about January, 1900, though

in the fall of 1897 he withdrew from active charge, the books were taken from his direct supervision to the office of the president, and his position was nominal. He signed such documents as were brought to him. No certificates of shares were issued to any of the stockholders of the Construction company until April 1, 1891.

On page 1 of the stock journal of the company, under the caption, "stock issued," is an entry showing the issuance to Holme of two hundred shares, under date of April 1, 1891, and on the opposite side, under the caption, "certificate canceled," appear words and figures indicating the cancellation of certificate No. 5 to Holme for two hundred shares, under date of October 7, 1891. On page 2 of the stock journal, under the caption, "stock issued," appears an entry of the issuance of one hundred and fifty shares to Holme on October 7, 1891, and just below this entry appears another showing the issuance to Holme, on the same day, of fifty shares. No cancellation of the one hundred and fifty shares appears. These entries in the stock journal were made among other entries relating to other stockholders.

In the account of Richard Holme, in the stock ledger of the company, an entry shows the issuance to him, on April 1, 1891, of certificate No. 5, for two hundred shares, from page 1 of the stock journal. Certificate No. 5 was never detached from its stub in the certificate book. It was signed by Holme as secretary, with the corporate seal attached. It was not signed by the president. There was endorsed on it a written assignment signed by Holme and dated October 7, 1891, wherein fifty shares were assigned to Richard Holme and one hundred and fifty shares to Richard Holme, and written across its face in the handwriting of Holme were the words, "Can-

celed October 7, 1891.'' The account of Richard
Holme in the stock ledger showed the cancellation
of certificate No. 5 on October 7, 1891, and the issu-
ance, on the same day, to Richard Holme, of certif-
icate No. 32, for one hundred and fifty shares, and
certificate No. 33, for fifty shares. Certificate No.
33, for fifty shares, was detached from the stub and
was surrendered and canceled on July 12, 1904, and
certificate No. 122, for fifty share's, was issued to
Elizabeth F. Holme in lieu thereof. . Certificate No.
32, for one hundred and fifty shares, was written up
to Mr. Holme, signed by the secretary, not signed
by the president, had the corporate seal attached,
and in that condition remained in the certificate book
attached to its stub. All the entries aforesaid in the
various books of the company remained unchanged
from the time they were made. In the account of
Holme, in the stock ledger, appear, in red ink, under
the main caption, ''Certificate Canceled,'' the fig-
ures, ''32''; under the sub-caption ''Certificate Num-
ber,'' and on the same line, under the sub-caption,
''Number of Shares,'' appear the figures ''150,'' in
red ink. No date appears on that line under the sub-
caption, ''Date.'' The entry in the next preceding
line is dated October 7, 1891, and in the next follow-
ing line, July 12, 1904. Below the account appear
the words, ''No. 32 not issued,'' in pencil. This
ledger was, in 1897, removed to another office or the
office of the Denver Union Water Company, away
from the direct care and supervision of Holme, and
was thereafter written up by an employee. This
employee made these red ink and pencil entries at
the direction of some officer, apparently the presi-
dent, when Holme was not present. There is no evi-
dence that Holme ever saw them or ever had any
connection with the book thereafter that would indi-

cate that he ought to have seen them or that he knew of them.

After the organization of the Construction company, and to and including April 17, 1894, there were eight stockholders' meetings held, one of which was an adjourned meeting. At each of these meetings, Holme was accredited as present, representing two hundred shares in person, and at each of the meetings, except the last two, when no vote was taken on any matter, he voted the two hundred shares. The president was present at most of these meetings, and some of the directors at all of them. No objections of any kind were made to his voting these shares. The fact that he was entitled to vote them was accepted in his case the same as in the case of any other stockholder. There was no meeting of the stockholders after April 17, 1894, prior to January 11, 1900.

On the 26th of May, 1890, at a stockholders' meeting, the capital stock of the company was increased to ten thousand shares of the par value of $100.00 each. This increase was subscribed for and disposed of. On February 14, 1891, certificates were filed in the office of the secretary of state and the recorder of the then Arapahoe county, signed and sworn to by the president and the directors of the company, certifying that the whole amount of the capital stock of the company had been subscribed for and that the whole thereof had been fully paid in cash. On May 1, 1889, the Construction company agreed to secure, at its own cost, the necessary land and rights-of-way, and construct a water-works system and use thereon, as specified, the patent pipe covered by the patent, transferred by Allen and Holme, all for the purpose of furnishing the city of Denver, its inhabitants and others, with water, and for this the Citizens' company agreed to pay the Construction

company all of the shares of stock of the Citizens'
company, except seven shares, together with certain
bonds of the latter. This contract was performed,
and all of the shares of the Citizens' company except
seven shares, were transferred to the Construction
company. Later, the Citizens' company transferred
the water system and all its property to the Denver
Union Water Company for certain considerations,
and the latter has owned and operated the system
and property ever since. Certain stock and bonds
of the Denver Union Water Company came to the
Construction company in this transaction, on account
of its being the holder of the stock of the Citizens'
company. From the time of the transfer of the pat-
ent, the three companies, to a greater or less extent,
used the pipe covered by the patent which had been
assigned by Allen and Holme. Several dividends
were declared by the Construction company, and the
dividends covering the fifty shares of stock, for
which Holme had received a certificate, were paid to
and receipted for by him. He was not paid any divi-
dends on the one hundred and fifty shares. Some
time after Christmas, 1902, Holme presented to the
secretary of the Construction company a statement
of an account between him and the company, credit-
ing the company with the principal and interest due
on his note and charging them with the dividends and
interest thereon, showing a balance due the company
from him of $7,813.00. At the request of Holme, this
was presented to the president of the company, and
the president stated that Mr. Holme had abandoned
all claim to his stock, that he had never paid the
note, and had no right now to make a demand for the
stock. This was conveyed by the secretary to Holme.
Negotiations were then taken up through attorneys
for a settlement. No definite conclusion was com-
municated to Mr. Holme prior to his death, which

occurred on the 12th day of July, 1903. Just before his death, the company concluded that Mr. Holme had no claim upon the stock, or any right to an accounting, but circumstances prevented the communication of this conclusion to Holme's attorney until after the death of Holme. Thereafter the appellee was appointed executrix, and tendered to the company the balance due on the note after deducting the dividends claimed, which tender was refused. The executrix, on July 14, 1904, commenced this action, praying for an accounting; that she be decreed to be the owner of the one hundred and fifty shares of stock, and that the certificate therefor be delivered to her, and for other relief, and offering to pay any sum of money that might be found due the company. There was a judgment for the executrix, finding that she was the owner of the one hundred and fifty shares and all dividends that had accrued on the stock, and that there was due the company the principal and interest on the note, and after deducting the dividends, there was still due the company the amount of $5,602.11 (the amount due the company was less than Holme's statement on account of a dividend declared thereafter); that a sufficient tender was made of the amount due, and refused, and that the said amount be paid into the registry of the court for the benefit of the Construction company, and ordering that a certificate be issued as evidence of the ownership of the one hundred and fifty shares of stock. From this judgment, the Construction company appealed.

The rights of Holme to the stock had their beginning in the motion or resolution of April 29, 1889. Of course this resolution of itself was not a contract, but a mere offer on the part of the company to Holme to do certain things for a certain consideration. The company offered to pay all

assessments upon a subscription of Holme for $15,-000.00 of the capital stock of the company, and, in consideration of such advancements by the company, Holme was to assign the patent right. By the assignment of the patent on May 3, Holme indicated his acceptance of the offer of the company. It is to be noted that the offer thus accepted by Holme was not an offer to extend the time to pay the assessments, the debt still to remain of the same character, to wit, a debt for stock, but the language is, that the company would pay the assessments, and it designates these payments as advancements in consideration for which the assignment of the patent was to be made. When these advancements were made by the company, then surely under this contract the stock was paid for, and Holme was indebted to the company, not for the stock, but for the advancements. If this is not so, then the company failed to do what the plain language of the resolution shows that it obligated itself to do, and for which Holme parted with the consideration required of him in the resolution. The plain import and language of the resolution which constituted the offer of the company, and, when accepted, the contract between it and Holme, and which will be referred to as the resolution contract, conveys no other meaning than that when the company paid the assessment, the character of the debt of Holme was changed from one for stock to one for money advanced. The entries in the books of the company seem to have been made in the line of this understanding of the contract between Holme and the company. The entry in the journal, from which Holme's stock account in the ledger was balanced, indicates that it was in accordance with the resolution of April 29th that the balancing was done. After all the entries were made, the books showed that Holme was no longer indebted to the company

for stock, but on the promissory note. The books say this note was for stock; but when the resolution, the recital in the journal that the item balancing Holme's account was in accordance with the resolution, and the recital that the note was for stock, are all considered and construed together, the conclusion is irresistible that, while the note was given for a debt originally for stock, the character of that debt had changed from one for stock, to one for the advancements provided for in the resolution, and for which Holme had paid a valuable consideration. The stock journal and stock ledger showed that he was the owner of the stock which the other ledger showed had been paid for. In line with the same idea is the certificate subscribed and sworn to by the president and directors of the company, certifying that all the stock was fully paid. Such a certificate could not have been truthfully made on any other theory, and it cannot be presumed that these men certified falsely or were ignorant of what they were doing. Appellant says that all these entries in the books were made by Holme or under his direction, and are not deserving of weight because self-serving. When the position of Holme in the company, first as manager and then as secretary and manager, from 1889 to 1891, covering the period when the entries were made, is considered, by what other person or under what other person's direction would these entries have been made? There was no concealment. The books containing the entries were, for years, open to the inspection of the president, directors, and stockholders. Before they were made, Holme voted at the stockholders' meetings the same as the others. After they were made, he did likewise. The note was listed among the other papers of the company, and was in the vault with them. It is incredible that, under all these circumstances, the officers, directors

and stockholders did not know of these entries and
note. To say that they did not, is to impute to them
the grossest negligence in the management of the
affairs of the company. No objections were made
to these entries or the note. They remained unchal-
lenged. The appellant also attaches some impor-
tance, as bearing on the resolution contract, to a re-
cital in the minutes of a meeting of the board of di-
rectors of the Construction Company on December
26, 1889, as follows: "'The matter of the contract
with Messrs. Holme & Allen in regard to the con-
tract was brought up, and after discussion, the whole
matter was referred to the next meeting of the
board.'' The appellant insists that this, in some
way, shows that the resolution contract was not com-
pleted, as the matter was never thereafter referred
to at any meeting of the board. It is not clear that
the recital refers to the resolution contract, and if
it does, it could only indicate that some negotiations
relative to it were in progress. The resolution con-
tract was made, and the consideration for it had
passed from Holme in May preceding this meeting.
All that could be done with it in December or there-
after was to abrogate or modify it by mutual con-
sent of Holme and the company. This recital does
not indicate that it was ever abrogated or modified
in any way, and the fact that it is never mentioned
thereafter, and that the patent was ever after kept,
used and enjoyed, is evidence that the contract re-
mained unchanged. The resolution contract, there-
fore, must be treated as an agreement between the
company and Holme as a subscriber to its stock,
that the company would pay his subscription to the
amount of $15,000.00, and the advancements made
by it for that purpose should thereafter be paid by
Holme. Thus, and for a valuable consideration paid
by Holme, was the debt, which he owed the company

for stock, extinguished, and converted into a debt for moneys advanced for his benefit to pay his subscription. Throughout the authorities runs the idea that such a transaction fairly made upon mutual considerations, as was the case here, is good between a company and a subscriber to its stock. There is no question of rights of creditors or other third parties involved in this action. It is between Holme and the company. This idea of the validity and efficacy of such a contract is well summed up by the supreme court of the United States, in *Sawyer v. Hoag,* 17 Wallace 610, at 619, as follows:

"Undoubtedly this transaction, if nothing unfair was intended, was one which the parties could do effectually as far as they alone were concerned. Two private persons could thus change the nature of the indebtedness of one to the other if it was found to be mutually convenient to do so. And in any controversy which might or could grow out of the matter between the insurance company and the appellant, we are not prepared to say that the company, as a corporate body, could deny that the stock was paid in full."

The *bona fides* and fairness of the contract between Holme and the company is unquestioned. The patent right which Holme had transferred, as the consideration for it, was very valuable to the company. In addition, and as a result of this contract, the company secured the promise of Holme to repay the advancements represented by his note for $15,-000.00. The pipe covered by the patent was used, by virtue of the transfer, through all the years that passed thereafter. Holme never repudiated the transfer of the patent. He never denied his liability on the note, but, on the contrary, acknowledged it as a subsisting obligation against him a short time before his death. The patent has been kept, used

and enjoyed. The note has been retained. A corporation cannot even repudiate an unauthorized transaction and retain the fruits thereof.—*Bank v. Hammond,* 25 Colo. 367; *Mulford v. Torrey Expl. Co.,* 45 Colo. 81.

How, then, can the company repudiate this transaction and keep and retain the fruits thereof? Here, then, was Holme, who had paid for his stock; whose stock account in the books of the company was balanced; whom the stock books of the company showed to be the owner of two hundred shares; who, without objection, was received, accepted and accredited as the holder of these shares at stockholders' meetings, by the officers, directors and other stockholders, and voted thereon precisely the same as any stockholder. Payment for the stock, its transfer to him on the stock books, the exercise, by him, of every right of a stockholder, with the full knowledge, consent, approval and acquiescence of the officers, directors and other stockholders, surely were enough to constitute a sale and delivery of the stock to him, as effectually as the delivery of such an intangible thing as a share of stock can be effected, and clothed him with every indicia or evidence of ownership, except the certificate. Why he did not have this is unexplained. He was entitled to it upon this theory of the resolution contract. The certificate was not necessary to complete ownership. A share of stock is the subject of ownership. The certificate of it is not the subject, but one of the evidences of ownership. The certificate is not the stock, but a representative of it.—*Marshall v. Marshall,* 11 C. A. 505 at 511; Cook on Corporations (6th ed.), § 192. The fact of ownership may be inferred from other facts, in the absence of a certificate.—*Wheeler v. Millar,* 90 N. Y. 353. In the light of all this, it cannot be said that Holme was not a stockholder

to the full extent of two hundred shares. Holme certainly was to get something for his valuable patent right, under the resolution contract. The only other theory that would give him anything is to assume that the resolution contract extended credit to Holme for the payment of $15,000.00 of his subscription to the capital stock. To assume this, however, violence must be done to the language of the resolution, and it must be further assumed that the officers and directors were mistaken when they made and filed the certificate of full paid stock. Waiving these things, if the contract was that Holme should have credit for the payment of his subscription to the amount named, then the promissory note represented a stock debt, and the character of the debt never changed. Leaving out of view cases where the rights of creditors and other third parties are concerned, for such is not the case here, that the company, for a valuable consideration, both parties acting in good faith, as is the case here, could make a binding contract for the extension of the time within which the stock was to be paid for by Holme, cannot be successfully controverted. There was no statute forbidding such a contract. By making it, the company secured a very valuable asset, one that was extremely useful and greatly advantageous in the accomplishment of the very object of its existence—the construction of a water-works system. Under the law, it could have issued full-paid stock to the amount of the value thereof for this patent. Why, then, could it not make a contract to merely extend the time of payment of the purchase price, whereby it secured to itself this patent, and, at the same time, reserved to itself the full amount of the subscription, with eight per cent. interest thereon, and all the rights to enforce its full payment given by the law, together with the right of forfeiture in case

of nonpayment. The right of the company to make such a contract is clear in the light of section 241, Gen. Stats. 1883, in effect when the contract was made, which provided that subscriptions for stock shall be payable "in such installments and at such time or times as shall be determined by the directors or trustees." The section, as amended, has the same provision. Besides all this, the company has used, enjoyed and retained all the fruits of the contract, and the note, and has never offered to surrender them.

Our statutes seem to recognize that an accepted subscriber to the capital stock of a corporation becomes a stockholder by the mere act of subscription, regardless of whether the subscription is paid or not. Section 241 of the Gen. Stats. 1883, and, as it was amended, section 480 Mills' Ann. Stats., section 850 Rev. Stats. '08, provides, among other things, that subscriptions shall be made payable to the corporation in such installments as may be determined by the directors; that an action may be maintained to recover any installment due and unpaid for twenty days after demand therefor, and, speaking with reference to a written demand upon the delinquent, the section does not describe him as a subscriber, but as a delinquent stockholder. The same section provides that the proceeds of any sale, over the amount due on the shares sold, shall be paid to the delinquent stockholder. No installment may have been paid, yet, under this section, the delinquent stockholder would be entitled to the proceeds of the sale over the amount necessary to pay his subscription. It might well be asked, if he was not the owner of the shares, why should this surplus be paid to him? Section 486, Mills' Ann. Stats., section 873 Rev. Stats. '08, says that each stockholder shall be liable for the debts of the corporation to the extent of the

amount that may be unpaid upon the stock held by
him. This section seems to recognize a subscriber
who has not paid his subscription as a stockholder.
In the light of these statutes, were it necessary to
hold that an accepted subscriber to the capital stock
is a stockholder, the following authorities, which
say that the effect of an ordinary accepted subscrip-
tion to the capital stock of the corporation makes the
subscriber a stockholder and it is not necessary that
he should have paid for his stock, would be worthy
of consideration: *A. & S. C. R. Co. v. Hill,* 20 Ore.
177; 1 Thomp. Corp., sec. 1139; *Wheeler v. Millar,
supra; Mitchell v. Beckman,* 64 Cal. 117; *Schaeffer
v. Mo., etc., Ins. Co.,* 46 Mo. 248; *The W. & M. R. Co.
v. Dwyer,* 49 Iowa 121.

But it is not necessary, in this case, to deter-
mine whether this is the law or not, for, in addition
to an ordinary accepted subscription contract,
Holme's rights are fortified by and based upon the
resolution contract, and under the construction of
that contract, now assumed, he procured the shares,
or the right to them, whatever it may be, on credit,
and he gave a consideration to the company for ex-
tending this credit. After making these subscrip-
tion and resolution contracts, and accepting, retain-
ing and enjoying their fruits, and in the fulfillment
thereof, the company, on its books and at its meet-
ings, and meetings of its stockholders, segregated
the stock from the common mass of stock, set it apart
for Holme and invested him with the indicia and the
rights and privileges of the owner and holder there-
of. What else can be done to deliver the first issue
of stock to a subscriber? What the company did is
consistent only with an intention to invest Holme
with the title to this stock. Shares of stock are per-
sonal property.—Sec. 480, Mills' Ann. Stats. The
general rule is, that where a sale of personal prop-

erty is made on credit, unless a different intention is shown by agreement or otherwise, the property in the goods passes on delivery to the buyer; and, in the absence of delivery, the property may pass, except as to third persons, although the seller retains the right of possession until the price is paid.—35 Cyc., 323.

Whether the resolution contract be regarded as one changing the nature of the debt of Holme to the company, or as one extending credit for the stock, enough has been said to demonstrate that he was the owner and holder of the stock in controversy, and such was his status at the last stockholders' meeting in April, 1894. The company never did anything, known to the law, to change the relation of Holme to the stock or wrest its ownership from him. All that was ever done pointing in the direction of a change was the marking of the red ink entries, "32" and "150," about June, 1899, by an employee, at the direction of one of the officers, on the cancellation side of the stock ledger, without Holme's knowledge, authority or consent, and without any previous action of the company, or any one else, either rightfully or wrongfully, upon which to base such entries. Rights cannot be disposed of in that way. Holme, his relation to the stock and the company remaining unchanged, so far as any action on its part was concerned, shortly after Christmas, 1902, presented his account, acknowledging his indebtedness to the company in the principal and interest of his note, claiming credits by way of dividends, and showing a balance due from him. Then, for the first time, he received an intimation from the president of the company that his status as a stockholder, which had theretofore been acknowledged openly and tacitly, so far as his knowledge went, was disputed, and, after a few

months spent in negotiations for a settlement, and after his death, his status at his death and theretofore existing, was repudiated. Thereupon, the executrix, within a year after the death of the testator, and in July, 1904, after having made proper tender, began this action. Now the appellant says that appellee's remedy was not in equity, but at law for damages. The relation of Holme as holder and owner of the stock in controversy being established, it is plain that the position of his executrix is not that of an outsider seeking to get in by virtue of a repudiated contract for the sale of stock, and the authorities cited by appellant, to the effect that the remedy is at law in such a case, are not in point. The executrix is in the position of one who is a stockholder, whose status, though once recognized, is repudiated, and who is seeking to have his status again recognized, and to have an accounting for what is due him arising out of that status. In the case of *Morey v. Fish Bros. Wagon Co.*, 108 Wis. 520, while the facts which made Morey a stockholder are different from those which made Holme one, yet Morey was a stockholder as Holme was one, and the principle in that regard is the same; the court said:

"Thus it appears that the action is not one brought by an outsider to compel the corporation to make him a stockholder, but an action brought by one who is already a stockholder, to compel recognition of his rights as a stockholder, which have been fraudulently or wrongfully denied him, and for incidental relief by way of accounting to ascertain what the profits upon his stock rightfully are, and what, if anything, is still due upon his note. Actions in equity for this purpose are not infrequent."

And, in Morawetz on Corporations (2d ed.), sec. 208, it is said:

(28)

"If the corporation refuses to recognize the real owner as a shareholder, or refuses to deliver him a new certificate of shares when entitled thereto, he may obtain specific relief by bill in equity, or may sue the company for the value of the shares."

This must be the true rule, for, otherwise, if a corporation or its officers desired to obtain the shares of a stockholder, all that need be done would be to repudiate the stockholder's relation as such, and then, under the doctrine contended for by appellant, the only remedy that the shareholder would have would be a suit at law for damages, and he would lose his shares. In other words, he would be compelled to sell his stock. He is not obliged to do so. He has a right to keep his interest in the corporation.—*Dousman v. Wisconsin, etc., Co.*, 40 Wis. 418.

In *Kinnan v. F. S. S. M., etc., R. Co.*, 140 N. Y. 183, the testator was a stockholder who had lost his certificates, and the executor sought to compel the issuance of new certificates. The testator, as was Holme, was a stockholder in a larger sense than a mere subscriber. The court said it was the ancient and admitted jurisdiction of equity to award specific relief in such cases, and that a summary remedy provided by statute was a cumulative remedy of a purely equitable character, to be administered by an equity court.

Furthermore, in this case, relief is prayed for in an accounting for cash and stock dividends and profits arising upon the stock. Such relief is especially equitable in its nature, and courts of equity will not refuse to entertain jurisdiction, when, in connection with obtaining a transfer of specific property, another and necessary relief is asked, which courts of equity, by their procedure, can best administer, and over which they have especial jurisdiction.—*Iron R. R. Co. v. Fink*, 41 O. St. 321. It

having been ascertained that Holme, up to at least April, 1894, was the holder of the stock in controversy, it becomes necessary to establish that, thereafter, he or his executrix, voluntarily or involuntarily, parted with the property in the stock, before it can be said that the executrix did not own it at the time of the commencement and trial of this action. The appellant claims that the executrix ought not recover, because Holme permitted the statute of limitations to run on the note, and had not paid it; because, during several years, the company was in financial straits and its stock depreciated, and it was only after the stock had risen in value that an effort was made to pay the note; because Holme had abandoned his stock subscription; because the statute of limitations had run against the action, and because Holme or his executrix, or both, have been guilty of laches. These claims of the appellant, its reasoning and authorities, are based on the assumption that this action is one for the specific performance of a contract of subscription. In other words, the appellant assumes that all that should be considered is the fact that Holme signed the subscription contract, ignores the fact that it performed that contract, and tries to argue away, and have ignored, the resolution contract, the assignment of the patent, the note, the entries on the books, the participation of Holme in the stockholders' meetings and the certificate of full-paid stock. The case sought to be made by appellant is not the case before the court. Nevertheless, its claims will be noticed as applied to this case. If the executrix had come into court seeking the relief she does, claiming that, inasmuch as the statute of limitations had run against the note, she was entitled to the stock and an accounting, without being obliged to account for the amount due on the note, her suit might not have

met with any favor. That is not her position. The defense of the statute of limitations is a personal privilege of a defendant, which he may plead or not, as he chooses. If he does not plead it, he waives it. The running of the statute does not extinguish the debt, but, if pleaded and sustained, bars the action only. This has been said many times by this court. Speculations on what might have been, cannot be indulged in. It is the situation that exists that must be considered. Holme never claimed any benefit from the statute of limitations, nor did anything to indicate that he would. On the contrary, before his death, he acknowledged, unreservedly, his liability to the company for the note and interest, and that was his position during the few months spent in negotiations for a settlement. His executrix tendered what was due on the note before commencing this action, and in her complaint alleges that she is ready and willing to pay anything that may be found due to the company, and the amount found due is now in the registry of the court for the appellant. If the debt of Holme to the company was one for stock or for advancements, judgment could have been obtained on the note, and the stock sold under execution; or, if a lien was reserved, the stock could have been sold to satisfy it, and in either case any balance remaining could have been collected from Holme or his estate; or, if the by-laws so prescribed and the debt was a stock debt, the stock could have been sold to satisfy it, as the statute and by-laws prescribed. Thus a feasible mode of procedure was provided by law to take the stock from Holme. The situation in this respect is the same in principle as in *Railroad Co. v. Fink*, 41 O. St. 321. In that case, it was said, if the stock was not disposed of in the way provided by law, or sold by the subscriber himself, it continued to be his property. It is further

said that it was the duty of the directors to collect stock debts, and it can be as well said that it was their duty to collect all the debts due the company, and they are guilty of a breach of that duty if they do not take all reasonable means for collecting what is due the company. It is further said in that case: If a corporation elects to waive its rights, and neglects its duty, it cannot complain if a subscriber asks to pay up his subscription in full, receive the certificates of his stock, and be invested with the privileges of a stockholder. In that case, there was also a time when the stock was depreciated, and when the administrator even refused to pay the overdue calls, but the court says: "It then became regular and legitimate for the company to sell the stock at public auction for what it would bring, * * * and thereby place the stock beyond the reach of the administrator, residuary legatee, or his assignee. But the company failed to adopt the statutory method of foreclosing the interest of the original subscriber. The title to the stock for which he subscribed remained unchanged and unimpaired by any action on the part of the company, with no bar to the right of the subscriber, or those claiming under him, to convert the shares into full-paid-up stock, and call for certificates."

In the case at bar, this reasoning can be applied upon stronger ground, for Holme had been invested with the stock and privileges of a stockholder, and the company, though in financial distress, instead of trying to collect the money and levy upon the stock, elected to waive its rights and neglect its duty, and did nothing to impair the title of Holme to the stock. There is no evidence that Holme ever refused to pay the note, or that the company ever asked or suggested its payment. It cannot now claim rights which it might have claimed and which it did not claim, either

through pure neglect of its duty, or out of considera-
ation for what it had obtained from Holme.

Abandonment is a question of intention. The
intention must be drawn from the facts and circum-
stances of each case. The party claiming an aban-
donment must establish that fact by clear and un-
equivocal evidence.—*Beaver R. Co. v. St. Vrain Co.,*
6 C. A. 136. Assuming the law to be that an owner
can abandon property so as to lose ownership of it,
it is evident that, before he can be said to have
formed the intention of abandoning it, his acts and
conduct must be positive, unequivocal and inconsis-
tent with his ownership of it.—*Beaver R. Co. v. St.
Vrain Co., supra; Faw v. Whittington,* 72 N. C. 321;
*Banks v. Banks,* 77 N. C. 186; *Dawson v. Daniel,* Fed.
Case No. 3669.

This record does not show any positive or un-
equivocal act of Holme, indicating that he intended
to abandon his property. So far as he was con-
cerned, he did not know that any person claimed that
he did not own the stock until shortly before his
death, and his actions then showed that he intended
to assert his right and not abandon it. Nor did he
do anything inconsistent with his right to the stock.
True, he receipted for a dividend on his fifty shares,
but the receipt covered only those shares. Nothing
was said about the others. He had a right to pre-
sume that the dividends upon the stock in contro-
versy would be credited on the note. He knew, and
the company knew, that payment to him of divi-
dends, under the circumstances, was a mere matter
of bookkeeping. In any event, his acceptance of a
dividend on fifty shares was not inconsistent with
his ownership of the other. The matter now in dis-
pute was not even mentioned or considered one way
or the other. This was not even a settlement of the
dividends on the other stock. The company could

not be deceived thereby, for it was in possession of all the facts. It knew, as Holme knew, that he was the accredited and recognized holder of the other stock. If the company, at the time, had formed the intention to repudiate Holme's relation, it knew that it had not communicated such intention to him, and he was ignorant of it. Under all these circumstances, it cannot be said that Holme, by taking dividends on the fifty shares, abandoned, or was estopped from claiming, his other shares.—*Crane Bros. Mfg. Co. v. Adams*, 142 Ill. 125; *Brown, Adm., v. Insurance Co.*, 59 N. H. 298; *Fay v. Tower*, 58 Wis. 286; *Ware v. Cowles*, 24 Ala. 446.

A corporation is a trustee for its stockholders, and is bound to protect their interests. — *Supply Ditch Co. v. Elliott*, 10 Colo. 327. It holds its property as trustee for its stockholders.—*Glengary Con. M. Co. v. Boehmer*, 28 Colo. 1. A stockholder has the right, therefore, to rely upon the fact that the corporation will preserve his right to his stock, and to presume that it will not assert an adverse claim to it.—*Owingsville v. Bondurant's Adm.*, 54 S. W. 718. This being so, Holme had the right to assume that the company would not appropriate its stock for his debt, except in a lawful way, which necessitated notice to him. When he left the employ of the company, the stock was his, and his rights were recognized as always before. He received no notice to the contrary, and he had the right to believe that his status continued. He had no right to presume that the company, his trustee, would violate its duty and arbitrarily attempt to foreclose him of his rights without notice, demand or opportunity to be heard. The first notice that he received that the company intended to repudiate his status as a stockholder and claim his stock adversely was after Christmas, in 1902. This trust relation existing between Holme

and the company, whatever its specific nature, was created with the consent of both, and it was a continuing trust.   It follows that, if lapse of time can bar an action in such a case, it did not begin to run, under the statute of limitations or the doctrine of laches, until the company repudiated the relation, claimed the stock adversely, and brought the repudiation and claim to the knowledge of Holme.—*Warren v. Adams,* 19 Colo. 515; *French v. Woodruff,* 25 Colo. 339; *Dennison v. Barney, post,* 442; *Marshall, Admx., v. Marshall,* 11 C. A. 505; *Roach v. Caraffa,* 85 Cal. 436; *Wells v. Green Bay, etc., Co.,* 90 Wis. 442; *Morey v. Fish Bros. Wagon Co., supra; Mercer Co. Ct. v. Springfield T. Co.,* 73 Ky. 254.

In *Kobogum v. Jackson Iron Co.,* 76 Mich., it is said:

"The corporation held all its property in trust for the parties interested; and whether treated as equitable tenants in common, or as stockholders, could make no particular difference.   There is no law which terminates the interest of a stockholder without some adverse action asserting its extinction or denying its existence, or which compels him to seek aid from courts when no such adverse position is taken."

It was about nineteen months after Holme received knowledge of the attitude of the company when this action was brought, during which time Holme died, his will was probated and the executrix appointed.   There is no statute barring an action of this kind in so short a time, nor did anything transpire that required the interposition of laches as a bar.   As to the dividends, less than six years intervened between the time they were declared and became payable and the commencement of the action. The company has received the full measure for the credit it extended Holme.   It kept and enjoyed the

patent for all these years. The full price of its stock, together with interest, as it agreed to accept when it received, accepted and retained the note, has been paid to it. It has not suffered, or, if it has, it has been through its own neglect and delay and because it did not proceed as the law allows. The judgment against the Construction company is, therefore, affirmed.

Before the introduction of any evidence, and during the trial, the Citizens' company and the Denver Union Water Company severally moved that the action be dismissed as to them, on various grounds. The motions were denied. In view of the fact that the action was finally dismissed as to the two companies, these rulings cannot be prejudicial if erroneous. At the close, the two companies were dismissed without costs, and they are now here complaining of this. The matter of costs in an equity proceeding is largely within the discretion of the judge, and his action thereon will not be disturbed unless such action is manifestly erroneous.—*Ratcliffe v. Dakan,* 16 Colo. 100; *Putnam v. Lyon,* 3 Col. App. 144; *Charlton v. Kelly,* 7 Col. App. 301.

The three companies filed a joint answer. While they were separate and distinct corporations, they were closely related in business matters and were all connected with the same enterprise. Some of the officers or directors in one were officers or directors in another or both the others. They were, or had been, all interested in the patent assigned by Holme. The note given by Holme was given to one, seemed to have been, for a time at least, in the undefined possession of another, and was finally produced by an officer of the third. The Construction company held the stock of the Citizens' company, and, for a time at least, stock and bonds of the Denver company. In this interlacing of interests, it was next

to impossible to tell which of the companies, if any, should be held until all the evidence was in. The evidence introduced is the same as would have been introduced were the Construction company alone on trial. No cost of the other companies separate from that of the Construction company is pointed out. Except in an amount so small as to be unworthy of notice, no cost is apparent that was not the cost of the Construction company. There is no effort made to segregate their costs, if there was any, from that of the Construction company, or to show that it can be segregated, or to demonstrate that payment of costs to them by the executrix would not be a payment *pro tanto* of the costs of the Construction company. In this situation, error of the court in dismissing the two companies without costs is not manifest, and its action in that regard is, therefore, affirmed.

*Affirmed.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE WHITE concur.