[No. 16846.  Department One.  October 21, 1922.]

# S. T. HILLS, *as Receiver of Western Truck Attachment Company, Appellant,* v. SKAGIT STEEL & IRON WORKS *et al., Respondents.*[1]

EVIDENCE (48)—RELEVANCY—MARKET VALUE. The value of a patent at any time is admissible as some evidence of its value at any other time.

CORPORATIONS (42)—STOCK—PAYMENT IN PROPERTY—VALUE—EVIDENCE—SUFFICIENCY. The stock of a corporation is shown to have been fully paid up, where it was issued in consideration of patent rights and other property which was fully equal to the par value of the stock, according to the belief of all the parties concerned, after full investigation.

Appeal from a judgment of the superior court for Skagit county, Brawley, J., entered August 22, 1921, in favor of the defendants, dismissing an action to recover unpaid stock subscriptions, tried to the court. Affirmed.

*George A. Joiner, Gates & Helsell,* and *Nelson R. Anderson,* for appellant.

*Coleman & Gable, Thomas Smith,* and *Peterson & MacBride,* for respondents.

BRIDGES, J.—Action by the receiver of an insolvent corporation against certain alleged stockholders to collect unpaid portions of stock. From a judgment in favor of the defendants, the receiver has appealed.

The prevailing facts are: In 1912, one R. W. Scott was engaged in the business of repairing automobiles in the city of Seattle. He did business under the name of Scott Machine Works. He was of a mechanical turn of mind and, during the course of his labors, conceived the idea of converting Ford touring cars

[1]Reported in 210 Pac. 17.

into light trucks by extending the frame and using the rear axle of the Ford car as a shaft from which the power was transmitted to the new rear axle of the truck. By the early part of 1915, his ideas had crystallized and he then made application for a patent to his invention. About the same time, he applied for a Canadian patent. The Scott Machine Works, during much of this time, was engaged in constructing trucks in accordance with the Scott ideas as applied for in the patent.

In November, 1915, Scott and one Wright incorporated the Western Truck Attachment Company for the purpose of building trucks according to the Scott idea. Its total capital stock was $50,000, divided into 500 shares, each of the par value of $100. Scott subscribed for 498 shares of the capital stock and Wright subscribed for the other two shares. Scott made a proposition to the company, which was accepted, that he would transfer to it all of the physical assets and good will of the Scott Machine Works and his patents and application for patents, both in the United States and in Canada, in full payment of his subscription for 498 shares of the capital stock of the company. This deal was shortly afterwards consummated and the company continued to manufacture trucks from Ford touring cars. In order to convert a Ford car into a truck, some thirty separate castings were required. Some of these were small and inexpensive and some larger and more costly.

The company worked along in this manner until March, 1917. During all of this time it was greatly handicapped in getting its necessary castings. By experience it had learned that those which it had purchased from the respondent Skagit Steel & Iron Works best suited its purposes, and it set out to make

some kind of permanent arrangements with that company whereby it would obtain castings in adequate numbers. It also desired some financial assistance from the Skagit Steel & Iron Works. After much negotiation, an agreement was finally made in the early part of 1917 between the attachment company and the Skagit Steel & Iron Works whereby the latter agreed to furnish the former the various castings needed at determined prices, and whereby it also agreed to furnish the attachment company certain credit and financial assistance. As a part of this transaction, it was understood that the Skagit Steel & Iron Works and its officers should have a controlling interest in the attachment company; and to that end Scott turned over to the Skagit Steel & Iron Works 220 shares, and to each of the respondents McIntyre, Faller and Powell, ten shares, all being a part of the stock previously issued to him.

It was not long after this arrangement was made that the United States entered the world war and the government commandeered the output of the respondent Skagit Steel & Iron Works and made it impossible for that company to furnish the attachment company with such amount of truck parts as were needed. As a result of this condition, and certain other things to be later mentioned, the attachment company began to get into financial trouble and its business began to fall away so that ultimately it went into the hands of a receiver. Long before the receiver was appointed, however, it was agreed between Scott representing the attachment company and the Skagit Steel & Iron Works that, inasmuch as the latter would be unable to perform its contracts to furnish castings in adequate numbers, the former transaction should be to a large extent annulled, and in November, 1917, all of the

capital stock which Scott had given to these respondents was by them assigned back to him.

The ultimate question in this case is the liability of the respondents to creditors. The briefs have taken a wide range and have discussed many important points of law. Most of them we find it unnecessary to decide. For the purposes of this case, the following principles of law, contended for by the appellant, will be conceded but not decided: (1) That respondents, as purchasers of the capital stock which had previously been issued to Scott, are liable to creditors for any unpaid portion of the stock in the same manner and to the same extent as if they were original subscribers for capital stock. (2) That, where stock is attempted to be paid for by turning in property, it is necessary, in order that the stock may be considered fully paid, that the property turned in was at that time of money value equal to the par value of the stock issued in payment therefor. (3) That the good faith of the corporation and its stockholders in taking the property in payment of the stock is immaterial, the only question being the actual value in money of the property turned over. (4) That the burden was on the respondents to prove that the property turned in by Scott in payment of the capital stock issued to him was of value equal to the par value of the stock so attempted to be paid for.

Conceding these contentions of the appellant, we are of the view that the judgment must be affirmed because the testimony shows that the property turned over to the attachment company by Scott in payment of the stock issued to him was actually worth, at the time it was so turned over, the par value of such stock. There was testimony tending to show the value of the Scott patents and application for patents, not only

at the time these properties were turned over to the attachment company in 1915, but also the value in money during the following two or three years. Appellant contends that, since we are to arrive at the value of the property at the time it was turned over to the company, any testimony tending to show the value or lack of value at any other time cannot be considered. This contention cannot be sustained. Any testimony which tended to show or reflect the value in 1915 would be admissible. Proof that a patent is of some value this year certainly tends to show that it was of some value last year.

We have read all the testimony as it appears in the statement of facts with reference to this question. It would prolong this opinion to undue lengths to go into too much detail concerning it. Generally speaking, it is shown that, when and before the attachment company was organized in 1915, Scott's application for patents had received favorable comment. He had already manufactured and sold a goodly number of trucks and had received and had on hand many unfilled orders. There appeared to be an almost inexhaustible demand for these converted trucks. About the same time Scott was working on his patent, other somewhat similar inventions had been worked out by other men throughout the United States and several large companies had been formed, particularly in the east and middle west, to convert cheap touring cars into light trucks. In 1915, 1916 and 1917, thousands of these trucks were being made throughout the country. The attachment company had extensive correspondence with the other manufacturers looking towards either a purchase of their rights or a sale to them of its rights. In 1917, Mr. Wilbra Coleman, an attorney of Skagit county, and Mr. E. J. Brown, an attorney of Seattle, made full investigations concern-

ing the value of the. Scott patents, and they testified that they had great value and were, at the time of the transfer to the attachment company, of value equal to the par value of its capital stock. It appears that, in 1917, certain interests in these patents or application for patents were sold for $50,000, plus certain other benefits and inducements of great value to the attachment company.

By 1918 or 1919, these patents, as well also all other patents of like character, became of very little value chiefly because the manufacturer of the Ford automobile commenced, on a very extensive scale, the manufacture of a Ford one-ton truck, and the smaller companies found themselves unable to compete in the open market with the Ford company. That all the parties concerned believed that the property turned over in payment of the attachment company's stock was of great value, and, in fact, of value greater than the par value of the stock of the company, there cannot be any doubt; nor can there be any doubt that, at the time these respondents received their stock, they made a full investigation of this question and took the stock in the full belief that it had been completely paid for and was non-assessable. In this connection it must be remembered that, in addition to the Scott patents and applications, all the physical property and good will of the Scott Machine Works were surrended to the attachment company. These physical assets appear to have been worth some two thousand dollars. The good will must have had considerable value, because Scott had been making and advertising this truck and it had become well known on this coast to persons interested in such things.

In common with almost all other courts, we have held that capital stock may be paid for either in money or money's worth. *Turner v. Bailey,* 12 Wash. 634,

42 Pac. 115; *Adamant Mfg. Co. v. Wallace,* 16 Wash. 614, 48 Pac. 415; *Kroenert v. Johnston,* 19 Wash. 96, 52 Pac. 605; *Dunlap v. Rauch,* 24 Wash. 620, 64 Pac. 807.

It appears that the patents applied for by Scott in Canada were issued in 1917, but that the patents applied for in the United States had not been issued at the time of the appointment of the receiver. The delay in the issuance of the patent in this country was the result of many other similar applications and it was contended by the various parties that there were conflicts and interferences. The testimony conclusively shows, however, that all, or nearly all, of the manufacturers of these trucks looked upon the Scott application as of great value and many negotiations were had looking towards its purchase or its consolidation with other patents or applications therefor.

That an application for a patent is such property as may be turned in in payment for capital stock, there cannot be any question. 4 Thompson on Corporations, pp. 3953 and 3965; 14 C. J. 434; *Whitehill v. Jacobs,* 75 Wis. 474, 44 N. W. 630; *New Haven Horseshoe Nail Co. v. Linden Spring Co.,* 142 Mass. 349, 7 N. E. 773; *Mountain Water Works Const. Co. v. Holme,* 49 Colo. 412, 113 Pac. 501.

On the facts we hold that this particular capital stock was fully paid for and was non-assessable, either in the hands of Mr. Scott or the respondents to whom he transferred it.

The conclusion to which we have come makes it unnecessary to discuss the other questions presented in the briefs.

The judgment is affirmed.

PARKER, C. J., TOLMAN, FULLERTON, and MITCHELL, JJ., concur.